**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Jamie CARTAGENA, Appellee.**

Superior Court of Pennsylvania.

Argued Sept. 20, 2012.
Filed Jan. 23, 2013.

Regina M. Oberholzer, Assistant District Attorney, Philadelphia, for Commonwealth, appellant.

Joseph K. Kelly, Philadelphia, for appellee.

BEFORE: FORD ELLIOTT, P.J.E., MUSMANNO, BENDER, DONOHUE, SHOGAN, LAZARUS, MUNDY, OLSON and WECHT, JJ.

OPINION BY DONOHUE, J.:

The Commonwealth of Pennsylvania ("the Commonwealth") appeals from the August 18, 2010 order of the Court of Common Pleas, Philadelphia County, granting the motion to suppress filed by Jamie Cartagena ("Cartagena"). The issue presented is whether the Commonwealth met its burden of establishing the legality of the warrantless protective sweep of Cartagena's vehicle. Upon careful scrutiny of the record and a survey of the applicable law, we conclude that the Commonwealth failed to present sufficient evidence before the suppression court to save the firearm discovered in the center console of Cartagena's vehicle from suppression. We therefore affirm the order of the suppression court, albeit on grounds different from those supporting its order.

On September 20, 2009, at 1:50 a.m., Officer Michael Johncola and his partner, Officer Glebowski[1] stopped Cartagena, who was driving a dark blue Chevrolet Suburban with tinted windows in violation of 75 Pa.C.S.A. § 4524(e)(1).[2] The police activated their lights, and Cartagena pulled over in the center breakdown lane of Lehigh Avenue. N.T., 8/18/10, at 4. According to Officer Johncola, who was the only witness called by the Commonwealth to testify, the windows were so heavily tinted that he could not see inside of the vehicle, even with the use of his flashlight. *Id.*

The officers approached Cartagena's vehicle, with Officer Glebowski on the driver's side and Officer Johncola on the passenger's side. *Id.* Both of the officers asked Cartagena to lower his window. *Id.* at 4, 7. Cartagena did not immediately respond. When asked a second time, Cartagena lowered his window.[3] *Id.* at 4. Officer Glebowski asked for his license, registration, and proof of insurance. Cartagena handed Officer Glebowski his license. Cartagena opened his center console, looked inside "like he was going to retrieve paperwork out of there[,] [ ... ] looked stunned and then closed it." *Id.* at 6. He then opened his glove box and retrieved his registration and proof of insurance. Officer Johncola described Cartagena as "extremely nervous, [ ... ] [t]ripping over his words and shaking." *Id.* at 5–6.

After Cartagena provided Officer Glebowski with the requested paperwork, be-

---

1. Officer Glebowski's first name does not appear in the certified record on appeal.

2. That statute provides: "No person shall drive any motor vehicle with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle." 75 Pa.C.S.A. § 4524(e)(1).

3. On direct examination by the Commonwealth, Officer Johncola testified that Cartagena lowered his window on the second request of the officers. Later on cross-examination, Officer Johncola testified:

Q. And you knocked on the window?
A. No. We're at um—we approached and both of us ask him to lower the window. Initially, he did not lower it. It took two or three chances before he lowered the window.
Q. At the preliminary hearing, did you say he stopped—let me see. Remember you said he didn't immediately roll down the window. You had to ask him a couple of times, so two times, right?
A. Yes.

N.T., 8/18/10, at 7–8.

cause of his "nervousness," Officer Glebowski asked Cartagena to step out of the vehicle, and Cartagena complied. *Id.* at 5. Officer Glebowski conducted a pat down search of Cartagena, and Officer Johncola conducted "a courtesy search"[4] of the driver's seat and the center console of Cartagena's vehicle. *Id.* The pat down search revealed no weapons or contraband; Officer Johncola recovered a loaded .32 caliber gun with an obliterated serial number from the center console of the vehicle. *Id.*

The police issued Cartagena a citation for the tinted windows and charged him with several violations of the Uniform Firearms Act.[5] On January 8, 2010, Cartagena filed a motion to suppress the gun, arguing that the police conducted the warrantless search of his vehicle without reasonable suspicion or probable cause.[6] The suppression court held a hearing on the motion on August 18, 2010. Officer Johncola was the only witness to testify at that hearing. In response to a question on direct examination by the Commonwealth, Office Johncola stated that he feared for his safety "when [Cartagena] first initially did not lower the window[.]" *Id.* at 6. At the conclusion of the hearing, the suppression court granted Cartagena's motion to suppress, as it found that the search of the center console was unlawful and done in violation of Cartagena's rights.[7]

---

4. The transcription of Officer Johncola's testimony may be erroneous since it is hard to imagine for whom this search was a courtesy. It is possible that the word used to describe the search was "cursory."

5. Specifically, police charged Cartagena with violating 18 Pa.C.S.A. §§ 6105, 6106, 6108, and 6110.2.

6. Cartagena challenged the validity of the search under both the Fourth Amendment to the United States Constitution and Article I,

On September 17, 2010, the Commonwealth filed a notice of appeal as well as an unsolicited concise statement of matters complained of on appeal pursuant to Pa. R.A.P. 1925(b). In its notice of appeal, the Commonwealth certified that the suppression court's order terminated or substantially handicapped the prosecution pursuant to Pa.R.A.P. 311(d). The suppression court authored a responsive opinion pursuant to Pa.R.A.P. 1925(a). On March 6, 2012, in a two-to-one non-precedential decision, a panel of this Court affirmed the decision of the suppression court. On March 14, 2012, the Commonwealth filed a motion for reargument *en banc.* On May 11, 2012, this Court granted the Commonwealth's request for reargument and withdrew its March 6 memorandum decision.

The case is now before the Court *en banc* for disposition. The Commonwealth raises the following issue for our review:

> Where police lawfully stopped a car late at night and [Cartagena], the driver, initially refused to lower his heavily-tinted windows, then became visibly nervous after looking in the center console of the car, did the lower court err in suppressing the gun found in the center console during a protective search of the car?

Commonwealth's Brief at 3.[8]

We review the suppression court's grant of a motion to suppress according to the following standard:

---

§ 8 of the Pennsylvania Constitution. Motion to Suppress Physical Evidence, 1/8/10, at ¶ 5.

7. The suppression court's order granting Cartagena's motion to suppress does not appear in the certified record on appeal. However, the suppression court issued its decision orally on the record at the August 18, 2010 suppression hearing, and the fact that the motion was granted is not contested.

8. Cartagena did not contest the legality of the initial stop by police at the suppression hear-

When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. [Where the defendant] prevailed in the suppression court, we may consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. However, where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

*In re O.J.*, 958 A.2d 561, 564 (Pa.Super.2008) (*en banc*) (quoting *Commonwealth v. Mistler*, 590 Pa. 390, 396–97, 912 A.2d 1265, 1268–69 (2006)) (internal citations and quotations omitted).

This case is controlled by the United States Supreme Court's decision in *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). In *Long*, the Supreme Court applied the principles announced in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),[9] to a search of the passenger compartment of a vehicle for weapons:

Our past cases indicate [ ... ] that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. *See Terry*, 392 U.S.[ ] at 21[, 88 S.Ct. 1868]. '[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.' *Id.* at 27[, 88 S.Ct. 1868]. If a suspect is 'dangerous,' he is no less dan-

---

ing; nor does he do so on appeal. Thus, we confine our discussion to whether the search of the vehicle was proper.

**9.** The Court in *Terry* held:

[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken. *Terry*, 392 U.S. at 30–31, 88 S.Ct. 1868.

gerous simply because he is not arrested.

*Long,* 463 U.S. at 1049–50, 103 S.Ct. 3469 (footnote omitted).

 The Court emphasized that this holding does not permit police to conduct a search of a vehicle during every investigative stop. *Id.* at 1050 n. 14, 103 S.Ct. 3469. "A *Terry* search, unlike a search without a warrant incident to a lawful arrest, is not justified by any need to prevent the disappearance or destruction of evidence of crime. The sole justification of the search is the protection of police officers and others nearby." *Id.* (citation and quotation omitted). The Court stated that an officer must therefore have reasonable suspicion that the person subject to the stop has a weapon in order to conduct a lawful search of the passenger compartment of a vehicle at the time of the stop.[10] *Id.*

In *Commonwealth v. Morris,* 537 Pa. 417, 644 A.2d 721 (1994), our Supreme Court applied the standard announced in *Long* to validate a vehicle search conducted during a traffic stop, finding the reasoning set forth in *Long* to be applicable to Article I, Section 8 of the Pennsylvania Constitution.[11] *Id.* at 422 n. 3, 644 A.2d at 724 n. 3. In that case, police stopped the defendant when he made a turn without signaling. *Id.* at 419, 644 A.2d at 722. As the officer approached the defendant's vehicle, he observed the defendant lean to his right toward the floor of the center of the car. *Id.* The officer told the defendant to put his hands on the steering wheel, but the defendant did not comply, and instead he reached quickly between his legs toward the floor on the driver's side. *Id.* The officer ordered the defendant out of the car and upon opening the door, the officer observed a 24–inch metal pipe wedged between the driver's seat and the door. *Id.* A pat down search of the defendant revealed no weapons. *Id.* The officer then searched the passenger compartment of the car and found a bag on the seat large enough to hold a weapon which, when opened, revealed cocaine, marijuana, and drug paraphernalia. *Id.*

The trial court denied Morris' motion to suppress, and on appeal following his con-

---

**10.** The *Long* Court found the search of the defendant's vehicle in that case to be lawful under the standard announced, as police had a "reasonable belief that Long posed a danger if he were permitted to reenter his vehicle." *Long,* 463 U.S. at 1050, 103 S.Ct. 3469. In that case, the police observed the defendant drive at a high rate of speed and then swerve into a ditch late at night in a rural area. The defendant did not initially respond to police questioning, and was believed to be under the influence of drugs or alcohol. Police frisked the defendant after they observed a large hunting knife in plain view on the floor of the car where the defendant was about to return. The police searched the area of the car for additional weapons that would be within the defendant's immediate control, and found marijuana inside a leather pouch located under the front seat armrest. The pouch was large enough that it could have contained a weapon. The Court found that "the intrusion was strictly circumscribed by the exigencies which justified its initiation." *Id.* at 1051,

103 S.Ct. 3469 (citation and quotation omitted).

**11.** Our Supreme Court has long held that in some respects, Article I, Section 8 of the Pennsylvania Constitution provides greater protection against unreasonable searches and seizures than the Fourth Amendment of the United States Constitution. *See, e.g., Commonwealth v. DeJohn,* 486 Pa. 32, 44, 403 A.2d 1283, 1289 (1979); *Commonwealth v. Edmunds,* 526 Pa. 374, 411, 586 A.2d 887, 905–06 (1991); *see also Commonwealth v. Brown,* 23 A.3d 544, 553 n. 8 (Pa.Super.2011) (*en banc*). Nonetheless, the *Morris* Court found that because *Long* is based on the rationale of *Terry* for permitting a limited frisk for weapons, and our Supreme Court has held that the limited pat down search allowed by *Terry* is also permissible under the Pennsylvania Constitution, "*Long's* reasoning is also applicable to Article I, § 8." *Morris,* 537 Pa. at 422 n. 3, 644 A.2d at 724 n. 3.

viction and sentencing, this Court affirmed that decision. The Supreme Court granted allowance of appeal and likewise affirmed, stating:

A review of the record reveals that under the circumstances encountered by [the officer] on May 8, 1990, a reasonably prudent man would have believed his safety was compromised. Appellant's leaning briefly to his right and towards the floor near the center of the car when he was stopped by the officer, as well as appellant's reaching quickly between his legs when he was ordered to place his hands on the steering wheel were acts consistent with an attempt either to conceal or reach for a weapon. In addition, the officer's discovery of a metal pipe wedged between the driver's seat and the door would tend to indicate that appellant might have access to other weapons in the passenger compartment.

Under *Long,* such a reasonable belief based on specific articulable actions taken by appellant (i.e. specific articulable facts) entitles an officer to conduct a search of those portions of the passenger compartment of a suspect's vehicle in which a weapon could be placed. Thus, the bag in question was properly searched since it was large enough to hold a weapon. Indeed, had [the officer] allowed appellant to return to his vehicle without searching the bag in question,

he would have been taking a grave risk that appellant would remove a weapon from the bag and use it. Our constitutional safeguards do not require an officer to gamble with his life. Thus, the search in question did not violate appellant's right against unreasonable searches under the Fourth Amendment of the U.S. Constitution or Article I, § 8 of the Pennsylvania Constitution.

*Id.* at 421–22, 644 A.2d at 723–24 (footnote omitted).

■ Applying these standards to the case at bar, the Commonwealth contends that "the police were justified in conducting a protective sweep of [Cartagena's] car when [Cartagena] was stopped late at night for extremely heavily tinted windows, disregarding an initial order to lower those windows, then exhibited extreme nervousness after opening and quickly shutting the center console of the car[.]" Commonwealth's Brief at 16. The suppression court found that the police lacked probable cause to search the vehicle, which the suppression court erroneously believed to be the applicable standard.[12] Suppression Court Opinion, 5/18/11, at 7. It further incorrectly found that exigent circumstances beyond the mere mobility of the vehicle (i.e., the risk of the destruction of evidence or the threat of harm to police or others) were required to search the car in the absence of a warrant, and none existed here.[13] *Id.* at 7–8. These errors by the

---

12. In Pennsylvania, the requirement of "specific and articulable facts" has been interpreted as requiring "reasonable suspicion." *See Commonwealth v. Farnan,* 55 A.3d 113, 116 (Pa.Super.2012).

13. We note that the standard employed by the suppression court is that which is required for police to conduct a warrantless search of the entirety of a vehicle. *See, e.g., Commonwealth v. Hernandez,* 594 Pa. 319, 328, 935 A.2d 1275, 1280 (2007) (stating that a warrantless search of a vehicle must be accompanied by

probable cause and exigent circumstances beyond the mobility of the vehicle). As indicated *supra,* this is not the standard required for police to conduct a protective search of the passenger compartment of a vehicle, which is the situation at issue here, and requires only reasonable suspicion that the person is armed and dangerous to be lawful. This is a rare exception to the requirement that police must have probable cause to conduct a search; probable cause is required even for the issuance of a search warrant. *See, e.g., Common-*

suppression court do not affect our decision because, as we previously stated, the suppression court's legal conclusions are not binding on this Court. *In re O.J.*, 958 A.2d at 564. Moreover, the law is well settled that if the record supports the result reached by the suppression court, we may affirm on any ground. *Commonwealth v. Lewis*, 39 A.3d 341, 345 (Pa.Super.2012).

After reviewing the notes of testimony from the suppression hearing, we find the Commonwealth's recitation of the specific and articulable grounds that would permit a protective search of the passenger compartment of Cartagena's vehicle to be largely unsupported by the record. The record does not support the Commonwealth's claim, for example, that Cartagena "exhibited extreme nervousness" only **after** he closed the center console. Rather, the record reflects that Officer Johncola did not testify that the nervousness occurred at any specific time during the stop, just that "[t]he male was extremely nervous[.]" N.T., 8/18/10, at 5.

Furthermore, there was no testimony that Cartagena "quickly shut" the center console, as the Commonwealth contends. According to Officer Johncola's testimony, Cartagena's closing of the center console appears to have been anything but "quick": "He goes to reach into the center console and **looks, hesitates, and closes** the center console." *Id.* (emphasis added). The officer went on to testify that when Cartagena went into the center console, "he looked into it like he was going to retrieve paperwork," *id.* at 6, which was precisely what he was asked to do. Not finding the requested paperwork in the center console, Officer Johncola testified that Cartagena opened his glove compartment, procured the paperwork and provided his registration and proof of insurance to Officer Glebowski. *Id.* at 5.

Officer Johncola did not testify that there was anything remarkable about the way Cartagena opened and/or closed the center console, only that he "looked stunned" before closing the compartment. *Id.* at 6. It appears Officer Johncola did not attach significance to the manner in which Cartagena opened and closed the center console, as Officer Johncola testified that they decided to subject Cartagena to a pat down and a protective vehicle search based solely upon Cartagena's "nervousness." *Id.* at 6.

We also do not agree, based on the testimony presented in this case, that Cartagena's failure to immediately respond to the officers' request to lower his windows is a factor weighing in favor of creating a reasonable suspicion that the officers' safety was in jeopardy. The Commonwealth asks us to attach a negative inference to the delay in Cartagena responding, stating that Cartagena "initially refused to lower his windows" and "ignored" the officers' first request to lower his windows. Commonwealth's Brief at 7, 11. The record, however, contains no testimony to support such an inference, as Officer Johncola did not testify to the length of the delay between the officers' first and sec-

---

wealth v. Johnson, —— Pa. ——, 42 A.3d 1017, 1031 (2012).

The suppression court further relied on *Commonwealth v. Reppert*, 814 A.2d 1196, 1206 (Pa.Super.2002) (*en banc*), which held that that nervousness and furtive movements by a passenger was insufficient to give rise to reasonable suspicion to conduct an investigatory detention of a passenger following a routine vehicle stop. Suppression Court Opinion, 5/18/11, at 7. Unlike the case before us, *Reppert* did not involve a question of the propriety of a protective search during the pendency of a vehicle stop, but an officer's ability to remove a passenger from a vehicle and conduct an investigative detention after the vehicle stop had concluded. *Reppert*, 814 A.2d at 1202. Thus, *Reppert* is not controlling.

ond request for Cartagena to lower his windows. We do not know whether the requests were back-to-back in rapid succession, or whether a discernible number of seconds passed before the officers ordered Cartagena to lower the window a second time.

The facts of this case as established by the testimony of Officer Johncola indicate that he and his partner activated the lights on their police vehicle to stop Cartagena at nearly two o'clock in the morning. Cartagena pulled over and the officers approached his vehicle, one on the driver's side and the other on the passenger's side. **Both officers** (apparently simultaneously) ordered Cartagena to lower the **windows** (*id.* at 4) or to lower the **window** (*id.* at 7). Whether the order was to lower one or both of the driver- and passenger-side windows, the orders coming from both sides of the vehicle certainly can explain the hesitation caused by potentially conflicting orders. The orders from the two police officers from both sides of the vehicle also provide a reason for Cartagena's nervousness or apprehension.[14] Regardless, it is clear that Cartagena complied by lowering both the driver- and passenger-side windows.[15]

In contrast to the Commonwealth's reccitation of the facts, our review of the record in this case reveals that it is significantly lacking in articulable facts that would allow us to reverse the suppression court's decision.[16] The entirety of Officer Johncola's testimony comprises little more than six pages of transcript, with the direct examination conducted by the Commonwealth covering just over three pages. The suppression hearing transcript contains no information about Officer Johncola's level of training or experience in conducting traffic stops (or even years of service) and is devoid of any testimony that Officer Johncola believed, based on his training and experience, that Cartagena possessed a weapon or had access to a weapon in his vehicle. *See Terry*, 392 U.S. at 30–31, 88 S.Ct. 1868; *Long*, 463 U.S. at 1049–50, 103 S.Ct. 3469; *see also In re O.J.*, 958 A.2d at 563 (officer testifying that police "normally" conduct a protective weapons search of a vehicle where they observe furtive hand movements during a stop, as "that behav-

14. The Commonwealth suggests that Cartagena may have been making furtive movements in the vehicle prior to lowering his windows, but because the windows were so heavily tinted, the officers could not see the movements. *See* Commonwealth's Brief at 14. This is not a presumption to which the Commonwealth is entitled, nor is it an assumption we are willing to make, as it would require us to make a finding of fact that is not supported by the evidence of record (*see In re M.D.*, 781 A.2d 192, 198 (Pa.Super.2001)), and is clearly not uncontradicted evidence presented by the Commonwealth (*see In re O.J.*, 958 A.2d at 564). In fact, the suggested conclusion is pure fabrication.

15. Although Office Johncola testified at one point that Cartagena lowered **the window** and provided Officer Glebowski with his license, he must have lowered both the driver and passenger windows. Otherwise, Officer John-cola would not have been in a position to see Cartagena produce his license and look into the center console for the registration and insurance information since the tint on the windows of the vehicle was so dark "even [a] flashlight on the side of the car did not penetrate the glass." N.T., 8/18/10, at 4.

16. The version of the facts recited in the Commonwealth's brief on appeal is compelling. Had it produced testimony supporting the evidence contained therein at the suppression hearing, or testimony from which reasonable inferences in its favor could have been drawn, we would be in a far better position to grant the requested relief and reverse the suppression court's decision. However, what the Commonwealth's witness or witnesses could have or should have testified to is irrelevant, as this Court is bound by the facts contained in the certified record and the case the Commonwealth actually presented.

ior creates a fear that a weapon may be located where the movements occurred.").[17] There was also no testimony describing the neighborhood in which this stop occurred, *i.e.*, there is no testimony that it was a high-crime area; only that police stopped Cartagena in the 100 block of Lehigh Avenue in Philadelphia.[18] N.T., 8/18/10, at 4; *see Commonwealth v. Murray*, 936 A.2d 76, 80 (Pa.Super.2007).[19] Furthermore, there is no indication that Cartagena did not immediately stop for the police (*see In re O.J.*, 958 A.2d at 563); that the police saw any weapons in the vehicle prior to conducting a the protective search (*see Long*, 463 U.S. at 1051, 103 S.Ct. 3469; *Morris*, 537 Pa. at 419, 644 A.2d at 722; *Commonwealth v. Rosa*, 734 A.2d 412, 413 (Pa.Super.1999)[20]); or that he made any movements that caused Officer Johncola to believe that Cartagena was in possession of a weapon or that Cartagena posed a safety threat (*see Commonwealth v. Foglia*, 979 A.2d 357, 359 (Pa.Super.2009) (*en banc*)[21]; *In*

---

17. In *In re O.J.*, police observed the defendant driving at a speed in excess of the posted limit and fail to stop at a stoplight. Police activated their lights and siren, but the defendant did not immediately stop. Once he pulled over, the police exited the cruiser and saw the defendant moving his arms and hands in the area of the center console of the vehicle. Police immediately removed the defendant and his passenger from the car and conducted a *Terry* frisk. After finding no weapons, the two were placed in the back of the police car. Police then conducted a protective weapons search of the center console—the area the police saw the hand movement—discovering cocaine therein. *In re O.J.*, 958 A.2d at 563. This Court reversed the lower court's suppression of the cocaine, concluding that the protective search was constitutionally valid based upon the stop occurring at night, the defendant's initial refusal to stop, the defendant's furtive movements over the center console, and the officer's testimony to his belief "that [the defendant] may have been [ . . . ] in possession of a weapon." *Id.* at 566.

18. In its concise statement of matters complained of on appeal, the Commonwealth stated that the stop in question occurred in a "high[-]crime area." 1925(b) Statement, 9/17/10. As we confirmed hereinabove, there is no testimony in the record that supports this assertion. The Commonwealth abandoned this contention in its argument in both its original brief on appeal and its substituted brief on reargument *en banc*.

19. In *Murray*, this Court found a protective search of a vehicle to be proper where the police testified that the vehicle had heavily tinted windows, the stop occurred late at night in a high-narcotics neighborhood, the defendant was observed making excessive movements as the police approached, and the police conducted the search immediately upon reaching the vehicle. *Murray*, 936 A.2d at 77, 80. The Commonwealth points to *Murray* as a case supporting reversal of the suppression court in this matter. Commonwealth's Brief at 14. Although we agree that the totality of the circumstances present in *Murray* support a finding that the police had reasonable suspicion to conduct a protective search of the vehicle, it is far from analogous to the facts and circumstances testified to in the case at bar. The record before us reveals that the only similarities between the cases are that the both vehicles had tinted windows and the stops occurred at night, which, as we explain *infra*, is insufficient for a finding of reasonable suspicion to conduct a protective vehicle search. Thus, *Murray* does not provide a basis to overturn the suppression court's suppression of the gun in question.

20. Police stopped the vehicle in *Rosa* at 1:24 a.m. for an expired license plate sticker. While approaching the vehicle, police observed the backseat passenger "moving around." *Rosa*, 734 A.2d at 413. While questioning the driver, the officer shined his flashlight inside the vehicle and observed several knives and crossbow arrows in plain view. Upon conducting a protective search of the vehicle, the backseat, which was not bolted to the floor, "flipped up," revealing two handguns underneath. *Id.* Based on *Long* and *Morris*, this Court reversed the lower court's suppression of the firearms. *Id.* at 417–20.

21. In *Foglia*, this Court sitting *en banc* found an investigative detention and *Terry* frisk to be

*re O.J.,* 958 A.2d at 563; *Commonwealth v. Wilson,* 927 A.2d 279, 284 (Pa.Super.2007) [22]; *Commonwealth v. Boyd,* 17 A.3d 1274, 1276 (Pa.Super.2011) [23]).

Rather, based upon the case presented by the Commonwealth at the suppression hearing, the only factors we can legitimately consider in determining whether the police had reasonable suspicion to conduct a protective weapons search of the passenger compartment of Cartagena's vehicle are: (1) the stop occurred at night, (2) Cartagena's windows were tinted, and (3) Cartagena appeared to be nervous. We acknowledge that each of these factors is properly considered in determining whether there was reasonable suspicion to conduct a *Terry* frisk or protective weapons search of a vehicle. *See, e.g., Murray,*

936 A.2d at 80; *Commonwealth v. Gray,* 896 A.2d 601, 607 n. 7 (Pa.Super.2006).[24] We are also mindful of the legal standard requiring that we view facts not in isolation but in light of the totality of the circumstances when determining whether the police officers here had reasonable suspicion to have concern for their safety. *Commonwealth v. Simmons,* 17 A.3d 399, 403 (Pa.Super.2011). Based upon the evidence of record, we conclude that the totality of the circumstances, taken together, fall short of a reasonable suspicion to conduct the search at issue in this case.[25]

We are cognizant of the potential dangers facing police officers approaching cars with heavily tinted windows. *See Murray,* 936 A.2d at 79–80 (quoting *United States v. Stanfield,* 109 F.3d 976, 981 (4th Cir.

proper where police observed the defendant—whose clothing fit the description of a man carrying a firearm from a radio broadcast from an anonymous source—in a high-crime area "grab[ ] around his waist area." *Foglia,* 979 A.2d at 358–59. The officer testified that this action by the defendant caused him to be concerned because "people usually [carry] weapons in their waistband." *Id.* at 359.

**22.** *Wilson* involved a *Terry* frisk of the defendant after he failed to stop at a stop sign. The officer testified that as he stopped the defendant he saw the defendant "was constantly looking into his rear view and side mirrors and his 'shoulders and stuff' were moving around." *Wilson,* 927 A.2d at 284. After running the defendant's information in the police cruiser, he returned to the defendant's vehicle and observed that the defendant's hands were in his pockets, where they had previously been in his lap. This caused the officer to be concerned, as he could not see the defendant's hands, and "from experience people usually put their hands in their pocket to conceal a weapon, among other things." *Id.* This Court found, in relevant part, that the *Terry* frisk was proper.

**23.** In *Boyd,* this Court reversed the lower court's suppression of crack cocaine found by police during a protective weapons search of the center console of a vehicle. Police testi-

fied that they observed the defendant in his vehicle stopped at an intersection through several green lights, impeding traffic, and repeatedly flashing his high beams. Upon stopping the vehicle for impeding traffic, police observed the defendant lean over and go into the center console, which the officer testified caused him to be concerned for his safety. *Boyd,* 17 A.3d at 1276.

**24.** In *Gray,* this Court held, *inter alia,* that a *Terry* search of a customer in a store for which police had a valid search warrant was not supported by reasonable suspicion, as testimony revealed only that police frisked Gray because he was "a little nervous" and "slightly sweating." *Gray,* 896 A.2d at 606. Although the Court recognized that nervousness was a relevant factor for determining reasonable suspicion, it stated that "nervousness alone is not dispositive and must be viewed in the totality of the circumstances." *Id.* at 606 n. 7.

**25.** Although the constitutionality of the *Terry* frisk was not challenged by Cartagena in his motion to suppress, the standard for a valid *Terry* frisk and the standard for a valid protective vehicle search are identical, *see Long,* 463 U.S. at 1049–50, 103 S.Ct. 3469, and therefore, this holding is equally applicable to a *Terry* frisk.

1997)). However, neither this Court, our Supreme Court, nor the United States Supreme Court has held that tinted windows *per se* give rise to reasonable suspicion to conduct a *Terry* frisk and search of the passenger compartment of a vehicle, or that it is a factor entitled to greater weight than others in making such a determination.[26]

Moreover, just as the presence of the tinted windows is part of the totality of the circumstances, the timing of the search must likewise be considered. The record reflects that the officers did not order Cartagena out of his vehicle immediately upon approaching his vehicle after confirming by inspection the darkness of the vehicle's window tint, nor was the search conducted immediately after Cartagena's unspecified delay in lowering the windows. By the time Officer Glebowski ordered Cartagena out of the vehicle and Officer Johncola conducted the protective vehicle search, Cartagena had lowered both of his windows and the officers could freely see into the passenger compartment of the vehicle. It was not until Cartagena complied with Officer Glebowski's directive to produce his license, registration, and proof of insurance that the police decided to conduct a *Terry* frisk and protective search of the vehicle. *See N.T.*, 8/18/10, at 5. Therefore, when the officers made the decision to conduct a *Terry* frisk and pro-

tective search of the vehicle, the window tint had receded as a factor in making a "reasonably prudent" person feel as though his or her safety was in jeopardy. *See Long*, 463 U.S. at 1049–50, 103 S.Ct. 3469. Indeed, as previously stated, Officer Johncola testified that he only conducted the protective vehicle search based upon Cartagena's "nervousness." N.T., 8/18/10, at 6.

We also note that there is no testimony from which we can draw an inference that Cartagena's nervousness resulted from fear that a weapon would be discovered by the police. Officer Johncola testified that Cartagena "looked stunned" when he opened his center console, but never testified that based on his training and experience, this reaction caused him to be in fear for his safety or the safety of others in the area.[27] *See N.T.*, 8/18/10, at 6. We reiterate that this search can only be legitimized if the officer had a reasonable suspicion that Cartagena was armed and dangerous. *Long*, 463 U.S. at 1050, 103 S.Ct. 3469; *Morris*, 537 Pa. at 422, 644 A.2d at 724.

It is the rare person who is not agitated to some extent when stopped by police, even if the driver is a law-abiding citizen who simply failed to notice or repair a broken taillight or was unaware that he or she was driving above the speed limit. Whether described as nervousness, appre-

**26.** There is no measurable amount of tint that renders a vehicle with tinted windows illegal in Pennsylvania. Tint is illegal if, from point of view of the officer, he or she is unable to see inside of a vehicle through the windshield, side wing, or side window. *See* 75 Pa.C.S.A. § 4524(e)(1); *supra* n. 2. There is no legislative history surrounding the passage of Section 4524 to elucidate the reason for this subjective standard. Furthermore, police are oftentimes making the initial determination of reasonable suspicion to suspect illegal tint from a distance of several car lengths away and at night, as were the circumstances in this case. *See N.T.*, 8/18/10, at 4, 7. Thus, it is

important in an analysis of the totality of the circumstances to view the presence of the tinted windows in the context of the officer's training and experience with stops involving tinted windows, as well as other factors.

**27.** Cartagena could have "looked stunned" for any number of reasons, not the least of which could have been his surprise to discover his registration and proof of insurance were not located in the center console as he initially thought, and his nervousness could have been the result of not knowing if he had those documents in the vehicle.

hension, concern or otherwise, forced interaction with a police officer is not an everyday occurrence for the average citizen. *Cf. Commonwealth v. Au,* —— Pa. ——, 42 A.3d 1002, 1010–11 (2012) (indicating that encounters with police are viewed through the eye of the reasonable person). Without more, the nervousness of a driver of a vehicle during a late night stop for suspected violation of the tinted window prohibition does not suffice to allow police to conduct a *Terry* frisk and a protective weapons search of a vehicle. A contrary ruling would serve to essentially eliminate a motor vehicle operator's protection against unreasonable searches and seizures guaranteed by the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.[28]

Absent some combination of evidence to give context to the encounter—for example, testimony that the stop occurred in a high-crime area; testimony regarding Officer Johncola's training and experience and its role in formulating a reasonable suspicion that Cartagena was armed and dangerous; and/or testimony illuminating the length of the delay in Cartagena lowering his windows—we cannot overturn the suppression court's decision to suppress the gun found during the search of the passenger compartment of the vehicle. To do so would require an unwarranted expansion of police officers' ability to conduct *Terry* frisks and protective vehicle searches, and a concomitant erosion of the rights of citi-

zens of Pennsylvania to be free of unreasonable search and seizure.

In the case of a motor vehicle stop, there is an obvious tension between the purpose of protecting individuals from unreasonable searches and seizures provided by the United States and Pennsylvania Constitutions and the recognized objective of protecting the safety of law enforcement officers. Courts are mindful that police officers risk their lives daily in the line of duty, especially when conducting a vehicle stop, as they do not know what they will encounter when they approach a car. *See Long,* 463 U.S. at 1049, 103 S.Ct. 3469 ("roadside encounters between police and suspects are especially hazardous"); *In re O.J.,* 958 A.2d at 565 ("One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view.") (quoting *New York v. Class,* 475 U.S. 106, 112–13, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986)). Upon a challenge to the legality of a protective search of a vehicle, an individual's right to privacy yields to officer safety when the Commonwealth meets its burden of establishing that "the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the sus-

---

**28.** The Commonwealth cites the Opinion in Support of Affirmance in *Commonwealth v. Micking,* 17 A.3d 924 (Pa.Super.2011) (*en banc*) (plurality), *appeal denied,* 612 Pa. 708, 31 A.3d 291 (2011), in favor of a determination that "extreme nervousness can provide reasonable suspicion for a protective search during a traffic stop." Commonwealth's Brief at 12 n. 5 (citing *Micking,* 17 A.3d at

930). *Micking,* however, is a plurality decision, and has no precedential value. The Opinion in Support of Reversal found that the totality of the circumstances testified to by the officer did not support a finding that he had reasonable suspicion to suspect the defendant was armed and dangerous. *Micking,* 17 A.3d at 933–34.

pect may gain immediate control of weapons." *Long,* 463 U.S. at 1049, 103 S.Ct. 3469 (citation omitted). On this barebones record that establishes nothing more than a late night stop of a vehicle suspected of having illegally tinted windows whose driver exhibited nervousness while complying with the officers' orders to lower the windows and produce license, insurance and registration information, we conclude the Commonwealth did not meet its burden of establishing the legality of the search at issue.

Order affirmed.

MUNDY, J. files a Dissenting Opinion in which SHOGAN and OLSON, JJ. join.

## DISSENTING OPINION BY MUNDY, J.:

I respectfully dissent from the learned Majority's decision to affirm the grant of suppression in this case. In my view, the uncontradicted evidence presented by the Commonwealth at the suppression hearing was sufficient to support a finding of reasonable suspicion on the part of Officer Johncola.

The Majority correctly utilizes the reasonable suspicion standard articulated in *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).[1] *See* Majority Opinion at 298. The United States Supreme Court has consistently observed that routine traffic stops often "resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry*[2][.]" *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 n. 29 (1984). However, the Supreme Court has also warned that said traffic stops are "espe-

cially fraught with danger to police officers[.]" *Long, supra* at 1047, 103 S.Ct. 3469. Police officers are permitted to "minimize the risk of harm by exercising 'unquestioned command of the situation'[.]" *Arizona v. Johnson,* 555 U.S. 323, 330, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009), *quoting Maryland v. Wilson,* 519 U.S. 408, 414, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); *see also Terry, supra* at 23, 88 S.Ct. 1868 (stating, "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties[ ]"). In recognizing these considerations, the Supreme Court has permitted limited searches of an automobile's interior where a suspect could have access to weapons.

Our past cases indicate then that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. [*See Terry, supra* at 21, 88 S.Ct. 1868.] "[T]he issue is whether a

---

1. At the outset, I agree with the Majority's determination that the suppression court improperly applied a probable cause standard, and that the correct test is reasonable suspicion under *Long.* My disagreement stems

from the Majority's application of that standard to the facts of this case.

2. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27[, 88 S.Ct. 1868]. If a suspect is "dangerous," he *is no less* dangerous simply because he is not arrested.

*Long, supra* at 1049–1050, 103 S.Ct. 3469 (footnote omitted); *see also Pennsylvania v. Mimms,* 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam) (stating that the interest in the safety of police officers during traffic stops is both "legitimate and weighty" for Fourth Amendment purposes).[3] It is with this constitutional framework in mind that we should analyze the facts presented by the Commonwealth to the suppression court.

During the suppression hearing, Officer Johncola testified to several factors that were present on the night in question.

Q: I want to take you back to the 20th of September 2009. Were you on duty as a Philadelphia Police Officer that day?

A: I was.

Q: On that day, did your tour of duty take you in or around the 100 block of Lehigh Avenue at around 1:50 a.m.?

A: Yes.

Q: At that date, time and location, Officer, what, if anything, did you observe?

A: Your Honor, at that date, time and location, my partner and I, Officer Glebowski, badge No. 2844, were assigned to the 25th District. At that time we observed a black or blue—dark blue Suburban with the Pennsylvania tag GJF8933, with heavy tinted windows. We activated our lights and the male

pulled over in the center breakdown lane of Lehigh Avenue.

We exited the vehicle and asked the male to lower the windows. He didn't initially and second time he finally did. I approached on the passenger side and my partner approached on the driver's side.

Q: If I can just cut you off right there for a second. Can you describe how dark the windows were tinted? Did it affect your ability to see inside the car[?]

A: Your Honor, the windows were so tinted that even our flashlight on the side of the car did not penetrate the glass.

Q: So once he finally put down the windows, tell me what did you observe?

A: At that point, my partner asked for license, registration and insurance. He handed his license to my partner. He goes to reach into the center console and looks, hesitates, and closes the center console.

. . .

He was looking inside the console which is an arm rest in between the two front seats of the car. Then at which time he goes to the glove box to retrieve the insurance and registration of the vehicle. The male was extremely nervous, Your Honor.

At that time my partner asked him to step out of the vehicle. I walked to the rear of the vehicle, to meet my partner and my partner did a pat down of [Appellee].

At that time I went to the driver's side and did a courtesy [sic] search of the seat and console area at which time from the console, I recovered a black

**3.** As the Majority correctly notes, our Supreme Court has noted that the United States Supreme Court's analysis in *Long* comports with Article I, Section 8 of the Pennsylvania Constitution. *See Commonwealth v. Morris,* 537 Pa. 417, 644 A.2d 721, 724 (1994), *cert. denied, Morris v. Pennsylvania,* 513 U.S. 1031, 115 S.Ct. 610, 130 L.Ed.2d 519 (1994).

and chrome brown .32 caliber loaded with six live rounds and an obliterated serial number and it was placed on a property receipt. He was issued a TBR for the tinted windows.

Q: Why did your partner take him out of the car?

A: Due to his nervousness.

Q: Could you describe what he was doing that made you think he was nervous?

A: Tripping over his words and shaking. He also didn't immediately roll down his windows. The reason why we were there was due to the extremely dark window detail.

Q: Where was this particular area?

A: 100 block of West Lehigh [Avenue].

Q: Can you describe the manner in which he was looking toward the center console?

A: It was just that he looked into it like he was going to retrieve paperwork out of there and kind like [sic] looked stunned and then closed it.

Q: So what's [sic] reason for you taking him from the car, just the fact that he's overly nervous?

A: Yes.

Q: Officer, at any time did you fear for your safety at all during this car stop?

A: When I first approached—when he first initially did not lower the windows, yes.

N.T., 8/18/10, at 3–6. Officer Johncola further described Appellee's hesitation to lower his window during cross-examination.

Q: You went over to the passenger side and your partner goes to the driver's side, right?

A: Yes.

Q: And you knocked on the window?

A: No. We're at um—we approached and both of us ask[ed] him to lower the window. Initially, he did not lower it. It took two or three chances before he lowered the window.

*Id.* at 7.

The Commonwealth avers that an examination of the aforementioned testimony reveals that Officer Johncola possessed the requisite reasonable suspicion to conduct a limited search of the center console. Commonwealth's Brief at 7. I agree. I find two recent decisions of this Court, *Commonwealth v. Murray*, 936 A.2d 76 (Pa.Super.2007), and *In re O.J.*, 958 A.2d 561 (Pa.Super.2008) (*en banc*), to be particularly instructive, as they each discuss factors enumerated by the Commonwealth establishing the required reasonable suspicion in the present case.

In *Murray*, police stopped a Range Rover for not signaling a turn in a high-narcotics area. *Murray, supra* at 77. The vehicle's windows were also tinted so that it was difficult for the officers to see what was going on inside, but the officer could nevertheless discern "a lot of movement in the vehicle." *Id.* After frisking Murray and finding no weapon, the officer conducted a *Long* search of the area near where Murray was sitting and found a .40 caliber handgun under the right armrest. *Id.* The *Murray* court concluded that the tinted windows combined with "the knowledge of the neighborhood being a well-known narcotics area, when coupled with the excessive movement inside the vehicle and hour of night, raised serious and obvious safety concerns that justified a search for weapons." *Id.* at 80.

In *O.J.*, the police observed a car speeding and failing to stop at a red light. *O.J., supra* at 563. The officers followed O.J. in their car and activated their lights and siren for O.J. to pull over. After initially ignoring the police car behind him, O.J. eventually pulled over. *Id.* Upon exiting their vehicle, the officers observed "a lot of

movement of the arms and the hands in the center area of the vehicle which would have been the [center] console." *Id.* (citation omitted). After removing O.J. and his passenger from the vehicle, the officer searched the center console and found cocaine inside. *Id.* Appellant moved to suppress the drugs found in the center console and the trial court granted his motion. This Court, relying in part on *Murray*, concluded that the officer's limited search was reasonable under *Long*. *Id.* at 566.

> In the present case, we conclude that Officer Tucker's protective search was constitutionally valid as based upon articulable facts supporting a belief that Appellee may have secreted a weapon in the area searched. The vehicular stop occurred at night, which creates a heightened danger that an officer will not be able to view a suspect reaching for a weapon. Appellee had been driving dangerously and initially refused to heed police efforts to stop his car. This evasive behavior supported Officer Tucker's fear that Appellee may have been engaged in criminal behavior and in possession of a weapon. Finally, Appellee's rapid and furtive hand movements over the console indicated that he may have been hiding a weapon in that location. This conclusion also was supported by the fact that the console had been left partially opened. Finally, the search in question was specifically confined to the area where the hand move-

ments had occurred. Given the totality of the facts at Officer Tucker's disposal, we conclude that he reasonably believed that a weapon may have been secreted in the console and that his search of that compartment was not unconstitutional.

*Id.*

In the case *sub judice*, Officer Johncola testified to four factors that led him to search the center console for weapons. First, the traffic stop occurred late at night. Commonwealth's Brief at 14. Second, Appellant ignored Officers Johncola and Glebowski's initial request to lower his heavily tinted windows. *Id.* at 11. Third, Appellant exhibited extreme nervousness, specifically when he opened and closed the center console.[4] *Id.* Finally, the Commonwealth emphasizes that Appellant's windows were so heavily tinted that the officers could not see anything Appellant was doing inside the vehicle, even with their flashlights. *Id.* at 14. In my view, these circumstances, when considered together, support the reasonable suspicion required for Officer Johncola to make a limited search of the center console for weapons.

The Majority dismisses Appellee's hesitation to comply with the officers' request to lower his window as immaterial to whether Officer Johncola possessed the required reasonable suspicion. Majority Opinion at 301. I disagree. Traffic stops are everyday occurrences in this Commonwealth. It is common sense to anticipate

---

4. As the Majority points out, the Commonwealth highlights the Opinion in Support of Affirmance from *Commonwealth v. Micking*, 17 A.3d 924 (Pa.Super.2011) (*en banc*), *appeal denied*, 612 Pa. 708, 31 A.3d 291 (2011), for the proposition that "extreme nervousness can provide reasonable suspicion for a protective search during a traffic stop." Commonwealth's Brief at 12 n. 5. The Majority correctly observes that in *Micking*, the *en banc* Court was evenly divided with one judge not participating, so the Opinion in Support of Affirmance has no precedential value. Majority Opinion at 306 n. 28. However, our Supreme Court has already decided that extreme nervousness displayed by a suspect during a traffic stop is a relevant factor in the *Terry* context. *See Commonwealth v. Rogers*, 578 Pa. 127, 849 A.2d 1185, 1189 (2004). By logical extension, I see no reason why it should not be a relevant factor in the context of a *Long* protective search, as *Long* is an extension of *Terry*.

that whenever a driver is pulled over by law enforcement for a traffic stop, the investigating officer will approach the driver's side window and request to speak to the driver, or at a minimum ask for the driver's license and vehicle registration. A driver pulled over for a traffic stop routinely expects to lower his window to interact with the police officer. *See* 75 Pa. C.S.A. § 6308(a) (stating that when a driver is pulled over by law enforcement for a Motor Vehicle Code violation, he or she "shall, upon request, exhibit a registration card, driver's license and information relating to financial responsibility, or other means of identification . . .").

Furthermore, it is reasonable for a police officer approaching a vehicle with windows so heavily tinted that a flashlight does not penetrate the tint to allow visibility of the interior passenger compartment to infer for their safety that the occupant may have a weapon. When this factual situation arises and the driver refuses or delays in rolling down the window, these facts are equally concerning when the officer is able to observe suspicious behavior such as furtive hand movements. As this Court recently noted in *O.J.*, "it appears that a significant number of murders of police officers occurs when the officers are making traffic stops." *O.J., supra* at 565 (internal quotation marks and citations omitted).

Additionally, I point out the reason for the traffic stop in this case was Appellee's tinted windows, which are illegal in this Commonwealth. *See* 75 Pa.C.S.A. § 4524(e)(1). I cannot agree that we should give Appellee credit on the constitutional level for successfully masking the interior of his car, in violation of the Motor Vehicle Code. I conclude the fact that Appellee refused the officers' initial request to lower his heavily tinted windows, which were so dark that the officers could not

see anything going on inside the vehicle, supported Officer Johncola's belief that his safety was in danger. Therefore, in my view, it is certainly a relevant factor when ascertaining whether Officer Johncola had the required reasonable suspicion for a search pursuant to *Long. See Commonwealth v. Tuggles*, 58 A.3d 840, 842–43 (Pa.Super.2012) (concluding a car passenger's refusal to show a police officer his hands is a relevant factor in determining whether the officer had the required reasonable suspicion to conduct a *Long* protective search of the car's center console); *see also United States v. Whitfield*, 634 F.3d 741, 744 (3d Cir.2010) (stating that in the *Terry* context "[i]t is not necessary that the suspect actually have done or is doing anything illegal; **reasonable suspicion may be based on acts capable of innocent explanation[ ]**") (internal quotation marks and citation omitted; emphasis added); *United States v. Moorefield*, 111 F.3d 10, 14 (3d Cir.1997) (stating that Moorefield's "refusal to obey the officers' orders [when combined with other factors] constituted suspicious behavior[ ]").

The Majority attempts to distinguish *Murray* on the grounds that "the only similarities between [*Murray* and the instant case] are that both vehicles had tinted windows and the stops occurred at night. . . ." Majority Opinion at 303 n. 19. While the Majority concludes, "*Murray* does not provide a basis to overturn the suppression court's suppression of the gun in question[ ]" because the case is not completely analogous, that is not the standard we must apply. Majority Opinion at 303 n. 19. As no case exists with this precise combination of factors, we must instead look to the totality of the circumstances of this case to decide whether Officer Johncola had the required reasonable suspicion to justify his search of the center console for weapons. *See Long, supra* at 1049–1050, 103 S.Ct. 3469. In my view, the factors of

the heavily tinted windows at a 1:50 a.m. traffic stop, coupled with Appellee's extremely nervous movements toward the center console, and his unexplained hesitation to lower his window, clearly support the required reasonable suspicion.

Moreover, the Commonwealth stresses that although the vehicle in *Murray* had tinted windows, the officer was still able to see into the vehicle enough to make out furtive movements on Murray's part, whereas in this case, Officer Johncola and his partner were unable to see into the interior of the vehicle at all, even with the aid of their flashlights. Commonwealth's Brief at 14; N.T., 8/18/10, at 4. The Majority dismisses this as immaterial. Majority Opinion at 302 n. 14. I disagree, as the context for a *Long* protective search is the safety of the officers during the traffic stop.[5] Moreover, I believe the Majority undervalues the *Murray* court's admonition regarding tinted windows in the context of traffic stops.

When, during already dangerous traffic stops, officers must approach vehicles whose occupants and interiors are blocked from view by tinted windows, the potential harm to which the officers are exposed increases exponentially, to the point, we believe, of unconscionability. *Indeed, we can conceive of almost nothing more dangerous to a law enforcement officer in the context of a traffic stop than approaching an automobile whose passenger compartment is entirely hidden from the officer's view by darkly tinted windows.* As the officer exits his cruiser and proceeds toward the tinted-windowed vehicle, he has no way of knowing whether the vehicle's driver is fumbling for his driver's license or reaching for a gun; he does not know whether he is about to encounter a single law-abiding citizen or to be ambushed by a car-full of armed assailants. He literally does not even know whether a weapon has been trained on

**5.** I emphasize that if this Court were analyzing the facts of this case under *Terry*, i.e. looking for reasonable suspicion that criminal activity is afoot, I would agree with the Majority that the fact that Appellee's windows were so heavily tinted that the beam from the officers' flashlights could not penetrate them is irrelevant. The mere fact that police cannot see something does not generally give rise to any suspicion of criminal activity. However, while *Long* is an extension of *Terry*, it presents this Court with a different inquiry. The question in this instance was not whether criminal activity was afoot, but rather whether there was reasonable suspicion on the part of the officers to "believ[e] that the suspect is dangerous and the suspect may gain immediate control of weapons." *Long*, *supra* at 1050, 103 S.Ct. 3469. In my view, the fact that the officers were approaching a vehicle at night with windows more heavily tinted to preclude any view of the interior, when they could deduce even **less** than the officer in *Murray* could, only heightens Officer Johncola's belief that his safety was, in fact, in danger.

However, I agree with the Majority that we should not presume that "guns follow tinted windows" as our Supreme Court has disapproved of this Court making similar presumptions in past cases. *See Commonwealth v. Grahame*, 607 Pa. 389, 7 A.3d 810, 811 (2010) (holding that this Court erred by "adopting a 'guns follow drugs' presumption in order to justify a protective search for weapons ...."). However, in this case, we have more than just tinted windows, as Appellee initially refused to comply with the officers' routine request to lower his window. As I stated above, when a driver hesitates to comply with an officer's request to lower windows so dark that he or she cannot deduce what is going on inside the vehicle, I believe the officers were reasonable in inferring that Appellee might have been making furtive movements. In my view, the "officers were not required to hope [Appellee] was not arming himself behind the heavily-tinted windows while they asked him to roll down the window...." *United States v. Newell*, 596 F.3d 876, 880 (8th Cir.2010), *cert. denied, Newell v. United States*, — U.S. —, 131 S.Ct. 147, 178 L.Ed.2d 89 (2010).

him from the moment the stop was initiated.

*Murray, supra* at 79–80, *quoting United States v. Stanfield,* 109 F.3d 976, 981 (4th Cir.1997), *cert. denied, Stanfield v. United States,* 522 U.S. 857, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997) (emphasis in original).

Moreover, the Majority concludes that *O.J.* is distinguishable from the present case because "there is no indication that [Appellant] did not immediately stop for the police...." Majority Opinion at 303. While this is factually accurate, I conclude that this distinction is immaterial to the overall constitutional significance of this case. While Appellant did not ignore the officers' request to stop his vehicle, he **did** ignore their initial request to lower his heavily tinted windows, which I believe to be of equal significance in a *Long* analysis.

In summary, I would hold that the uncontradicted facts and circumstances articulated by Officer Johncola were sufficient to form the required reasonable suspicion to "believ[e] that [Appellee was] dangerous and ... may gain immediate control of weapons." *Long, supra* at 1050, 103 S.Ct. 3469. Based upon my review of the certified record, I conclude that Appellee's Fourth Amendment rights were not violated. I would therefore reverse the order granting Appellee's suppression motion and remand for further proceedings. I respectfully dissent.