J-S35040-17

**NON-PRECEDENTIAL DECISION- SEE SUPERIOR COURT I.O.P.65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TYSHAUN DEVOE MICKEL | : | No. 47 WDA 2017 |

Appeal from the Order Entered December 8, 2016
In the Court of Common Pleas of Mercer County
Criminal Division at No(s): CP-43-CR-0001438-2016

BEFORE: LAZARUS, RANSOM, JJ., and STEVENS, P.J.E.[*]

DISSENTING MEMORANDUM BY STEVENS, P.J.E.: **FILED: NOVEMBER 22, 2017**

This Court has recognized that "[w]e must be guided by common sense concerns that give preference to the safety of the police officer during an encounter with a suspect where circumstances indicate that the suspect may have, or may be reaching for, a weapon." *Commonwealth v. Parker*, 957 A.2d 311, 316 (Pa.Super. 2008) (quoting *Commonwealth v. Stevenson*, 894 A.2d 759, 772 (Pa.Super. 2006)). Here, the totality of circumstances confronting Officer Lehman at the time of the traffic stop in question created a reasonable suspicion that Appellee Mickel may have posed a threat of violence warranting a weapons search of all areas inside

_____

[*] Former Justice specially assigned to the Superior Court.

the cabin of his vehicle within his reach.  The locked glove compartment was among those areas.  Accordingly, I dissent.

In **Michigan v. Long**, 463 U.S. 1032 (1983), the United States Supreme Court extended the **Terry**-stop doctrine—allowing protective searches of a person's body—to searches of those portions of the passenger compartment of a car where a weapon could be hidden:

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.  **See Terry [v. Ohio]**, 392 U.S. at 21 [88 S.Ct. at 1879].  "[T]he issue is whether a reasonably prudent man would be warranted in the belief that his safety or that of others was in danger."  **Id.,** at 27 [88 S.Ct. at 1883].

**Id.,** at 1049-1050.  In **Commonwealth v. Morris**, 644 A.2d 721 (Pa. 1994), our Supreme Court adopted the **Long** standard for assessing the constitutionality of a protective search of the interior of a car for weapons.

Here, the trial court opined that a search must be limited to those areas where the defendant may have been trying to conceal a weapon.  Trial Court Opinion at 7.  "Given that there were no movements toward the glove compartment and it was locked, there is no articulable facts [sic] to warrant a reasonably prudent man to conclude there was a gun in the glove compartment."  **Id**.  The trial court's opinion finds support in neither **Long** and its progeny nor in the evidentiary record below.

*Long* does not limit the scope of a protective search to the precise location within the cabin where a suspect was seen reaching. Instead, as noted *supra*, a protective search may extend to all areas in the vehicle where the suspect, whose conduct has raised a reasonable suspicion that he poses a safety risk, may gain immediate control of a weapon.

Moreover, the notes of testimony below establish that Officer Lehman observed Mickel "reaching around within the vehicle," N.T. at 5, including the "center cons[ole]" and "the rear and passenger side of the vehicle," N.T. at 14, before the officer approached the driver's side window. The officer's testimony, therefore, indicated that Mickel was reaching in numerous locations within the cabin, including the passenger side of the vehicle where the glove compartment was located. A reasonable inference from this evidence is that the passenger side location of the glove compartment was within Mickel's reach and immediate control during the course of the traffic stop.

A question remains as to whether a locked glove compartment, itself, was under Mickel's immediate control so as to justify a search thereof. In **Commonwealth v. Micking**, an eight-member *en banc* panel of the Superior Court split evenly on the question of whether a protective search of a locked glove compartment during a routine traffic stop was justified under **Long** and **Morris**. The search uncovered two loaded handguns that formed the evidentiary basis for firearms convictions.

- 3 -

The plurality opinion in support of affirmance determined that the officers reasonably believed that the driver posed a danger warranting a protective search for weapons. The specific and articulable facts supporting this decision included the officers' observation of very nervous behavior on the part of the driver–consisting of trembling voice and shaking hands—considering the relatively minor reason for the stop (an expired registration).

The plurality for affirmance determined, further, that the locked glove box was part of the area subject to a protective search, as it was within the driver's "immediate control," since the driver was only under police supervision and was not in custody or detention at the time. *Id.*, at 928 (*citing Long*, 463 U.S. at 1051-52 (acknowledging that a *Terry* suspect not placed under arrest may break from police control and retrieve a weapon from his vehicle or, if permitted to reenter his vehicle, regain easy access to any weapons inside)).

The plurality opinion in support of reversal ["*Micking* dissent"] "fully agree[d] with the discussion in the Opinion in support of affirmance addressing the need for police officers to be protected in the line-of-duty," but it found that the officers' failure to first conduct a pat-down of the defendant's person belied their assertion that they believed defendant to pose a legitimate risk of danger warranting a protective search of the vehicle. Without first searching the defendant's person, therefore, the search of the vehicle was tantamount to an unlawful warrantless search for

- 4 -

contraband, the dissent concluded. Specifically, the ***Micking*** dissent explained:

> However, our review of the record reflects that the facts presented at the suppression hearing do not support the trial court's conclusion. As the Opinion in support of affirmance indicates, "[t]he issue before us is properly defined as whether the protective search of the glove box was fueled by reasonable suspicion that Appellant may have been armed and dangerous." Slip Op. at 14. Upon review of the transcripts, there is no doubt that Officer Tamulis failed to ask Appellant to exit the vehicle prior to the search of the passenger compartment and the glove box. Likewise, our review further indicates that, contrary to the statement of the trial court, Officer Tamulis failed to conduct a patdown search of Appellant for weapons. Rather, Officer Tamulis stated simply that he conducted a "protective pat down of the area" for his and his partner's "safety." N.T., 2/10/08, at 7.[1] Thus, the officer failed to establish that he had a reasonable belief based on specific articulable facts, which would have entitled him to conduct a search of the portions of the passenger compartment of the vehicle in which a weapon could be placed pursuant to ***Morris***.
>
> It is our opinion that, if the officer was indeed concerned for his safety, he would have first directed Appellant to exit the vehicle and conducted a patdown of the Appellant before the officer searched the automobile and the locked glove box. Consequently, due to the state of the record before this Court, we are left to conclude that the trial court erred in its determination that Officer Tamulis possessed the necessary reasonable suspicion to justify a warrantless search of the locked glove box.
>
> …
>
> We question whether any officer, concerned for safety, would fail to search a vehicle's occupants prior to searching a locked glove box in a vehicle. For these reasons we register our dissent and would reverse on this issue

***Micking***, 17 A.3d at 933–34 (Pa.Super. 2011) (*en banc*) (opinion in support of reversal).

The ***Micking*** dissent, therefore, condemned the glove compartment search only to the extent that the officer's prior actions, in the dissent's opinion, failed to reflect genuine safety concerns justifying a weapons search. Here, in contrast, Officer Lehman's concern for his safety was evident prior to his protective search of the vehicle.

Upon witnessing Mickel dipping and reaching around the interior of his car at the outset of the late night traffic stop, Officer Lehman called for back-up and waited for its arrival. Only when back-up arrived did the officer exit his patrol car and commence his personal interview with Mickel, where he observed that Mickel was unable to remain still even after being instructed to do so.

Officer Lehman asked Mickel to exit the vehicle and patted him down for weapons, which uncovered what the officer considered a potential make-shift weapon in Mickel's pocket, namely, a six-inch steel drill bit. Accordingly, Officer Lehman asked Mickel to remain outside the vehicle with the other officer while he searched the cabin. During the course of the weapons search, Mickel was neither under arrest nor handcuffed.

The cabin sweep disclosed both a block of copper wool[1] stored in an eyeglass case on the back seat along with fragments of copper on the front passenger floor. Officer Lehman knew the copper wool was commonly associated with crack cocaine consumption, and it was reasonable for him to suspect from the fragments that the copper had been put to that illicit use.

At that point, the officer continued his search of the cabin by taking the keys from the dashboard and opening the glove compartment. Given the totality of circumstances known to the officer at that time—the late night setting of the stop, Appellee Mickel's dipping and reaching around the cabin before the officer encountered him, Mickel's nervousness despite the relatively minor reason for the stop and his inability to calm down when instructed to do so, and the presence of copper fragments on the front passenger side floor consistent with potential crack cocaine use—Officer Lehman had reason to ensure that Appellant did not have access to a firearm within his immediate reach in the vehicle's cabin.

Therefore, it is clear that the facts which caused the *Micking* dissent to deny the reasonableness of the officers' asserted safety concerns in that case are simply not present in the case *sub judice*. As such, I find the rationale of the *Micking* opinion in support of affirmance to militate in favor

---

[1] The copper wool goes by the commercial name "Chore Boy," a product intended for scrubbing metal pots.

of finding Officer Lehman's weapons search of the glove compartment reasonable.

I likewise distinguish the present matter from the holding reached in **Commonwealth v. Cartagena**, 63 A.3d 294 (Pa.Super. 2013), also relied upon by Appellee and the suppression court, where a six-member majority of our Court, sitting *en banc*, affirmed an order granting a motion to suppress evidence obtained during a purported protective weapons search. Specifically, the majority held that officers lacked reasonable suspicion to perform a protective weapons search of a vehicle stopped for illegally tinted windows despite the driver's alleged "extreme nervousness." The search of the center console uncovered a loaded handgun with an obliterated serial number.

At the suppression hearing, the officers testified that the defendant did not roll down the excessively tinted windows when initially asked, forcing the officers to ask a second time before he complied. But the *en banc* majority disagreed that this testimony reasonably supported the officers' purported safety concerns where the driver's delay was just as likely caused by his confusion from receiving simultaneous orders from two officers standing on opposite sides of his vehicle. This, too, could have caused the defendant's nervousness or apprehension he exhibited during his personal exchange with the officer, the majority reasoned. In any event, the driver complied when he opened both windows at the second command.

The majority also declined to discern "extreme nervousness" from the way the driver opened and closed his center console when asked to produce his driver's license and registration. Contrary to the Commonwealth's assertion that the defendant "quickly shut" the console lid after opening it, the majority noted that the officers actually testified that the driver "looked stunned" when he opened the console for the requested papers, hesitated, and then closed the console and opened the glove box where he immediately retrieved his paperwork. The majority continued:

> "[The defendant] looked into [the console] like he was going to retrieve paperwork," [the officer] testified, which was precisely what he was asked to do. . . . [The officer] did not testify that there was anything remarkable about the way [the defendant] opened and/or closed the center console, only that he "looked stunned" before closing the compartment. It appears [the officer] did not attach significance to the manner in which [the defendant] opened and closed the center console, as [the officer] testified that they decided to subject [the defendant] to a pat down and a protective vehicle search based upon [the defendant's] "nervousness."

*Id.*, at 301 (citations to record omitted).

According to the court, the sum of evidence bearing on the issue of officer safety was that the setting was nighttime, the defendant's windows were tinted, and he looked nervous after the officers engaged him. *Id.*, at 304. There was, however, no testimony that officers feared for their safety. Moreover, the majority noted, the officers' initial concern with the window tint necessarily receded once the defendant rolled down the windows, which allowed the officers to see clearly within the cabin well before they decided

to commence a weapons pat-down. *Id*. In recognition of these facts, the officers testified they based their decision to conduct a protective weapons search solely on witnessing the defendant's nervousness.

Here, in contrast, Officer Lehman was concerned not only with Mickel's nervousness and refusal to obey his command to sit still during the personal interaction, but also with Mickel's prior conduct at the outset of the stop, where he was seen reaching down and around the entire cabin and console area of the car. On similar facts, this Court has found that an officer articulated sufficient facts to create reasonable suspicion justifying a protective weapons search. *See Parker*, *supra*, 957 A.2d at 315-16 (holding reasonable suspicion established to pat down driver pulled over for malfunctioning brake light where officer observed driver reaching down and dipping his shoulders right and left before officer approached). Furthermore, as noted above, Officer Lehman testified that he was concerned for his safety during the nighttime traffic stop and, for that reason, called for back-up and waited for its arrival before he walked to Mickel's car.

Based upon the evidence of record and controlling precedent, I conclude that the totality of circumstances created a reasonable suspicion to conduct a protective weapons search of Mickel's glove compartment, as Officer Lehman was justified in confirming Mickel had no access to weapons that could harm him in the line of duty. It follows, therefore, that Officer Lehman appropriately opened the purse located inside the glove box, as a weapon secreted inside would have been within the immediate control of

Mickel. **See Morris**, 644 A.2d at 722 (upholding protective weapons search of closed plastic bag in back seat of vehicle after weapons pat down of suspect's person, prompted by driver's leanings and quick reaching toward car floor, produced no weapon).

For the foregoing reasons, I would reverse the order suppressing evidence contained in the purse, and remand for further proceedings consistent with this decision.