J-A26031-22

2023 PA Super 6

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                               :               PENNSYLVANIA
                               :
            v.                     :
                               :
                               :
RASHEED MUHAMMAD               :
                               :
           Appellant          :      No. 84 EDA 2022

Appeal from the Judgment of Sentence Entered November 30, 2021
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0001435-2019

BEFORE:  BOWES, J., KING, J., and PELLEGRINI, J.[*]

OPINION BY PELLEGRINI, J.:                  **FILED JANUARY 9, 2023**

Rasheed Muhammad (Muhammad) appeals from the judgment of sentence imposed following his jury conviction in the Court of Common Pleas of Delaware County (trial court) of resisting arrest and firearms not to be carried without a license.[1]  Muhammad challenges the trial court's denial of his motion to suppress evidence and the sufficiency of the evidence supporting his conviction.  We affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 5104 and 6106.  Muhammad was found not guilty of person not to possess a firearm and two counts each of conspiracy to commit forgery and forgery.

**I.**

**A.**

This case arises from a December 2018 incident during which police confiscated a firearm from the center console of the rental vehicle that Muhammad had been driving. When Muhammad was approached by police, Muhammad's co-defendants, Henry Clark (Muhammad's since-deceased uncle) and Geraldine Briggs were attempting to cash bad checks at a PNC Bank while he was parked outside the bank. Following his arrest, Muhammad filed a motion seeking suppression of the firearm seized as unlawfully obtained.

Patrol Sergeant Matthew Egan of Media Borough Police Department was the only witness at Muhammad's August 28, 2019 suppression hearing. Sergeant Egan testified that he has been a police officer for 30 years and has received extensive training in recognizing warning signs signaling that an individual is potentially armed and dangerous. He also has had firsthand experience in dealing with such suspects. Sergeant Egan recounted that on the day of the incident, at 2:45 p.m., he responded to a report of a check fraud in progress at the PNC Bank located on the corner of State Street and Veterans Square. The Sergeant explained that he was driving an unmarked SUV and was wearing plain clothes at the time because he was filling in for the Police Chief, who was on sick leave that day. In the 911 call, the PNC Bank manager indicated that two people were attempting to cash bad checks

at the bank and that the female involved had walked back and forth to a gray Kia Soul parked outside.

Upon arriving at the scene, Sergeant Egan observed Muhammad's blue Kia Soul parked directly across the street from the bank on Veterans Square. The Sergeant parked his vehicle behind the Kia, effectively blocking it in. As he was exiting his vehicle, the brakes and reverse lights of the Kia briefly activated. Sergeant Egan effectuated the stop based on the 911 description of the vehicle and his observation that there was only one Kia Soul in the area adjacent to the bank. (*See* N.T. Suppression, 8/28/19, at 21).

Muhammad was the sole occupant of the Kia and he was sitting in the driver's seat. As Sergeant Egan approached the car, Muhammad began to open the door and asked if he was allowed to park there. The Sergeant observed a strong odor of marijuana coming from the vehicle and asked Muhammad for his driver's license, registration and insurance card. Muhammad produced a Pennsylvania driver's license and indicated that, although he did not have the other documents, he did have the rental agreement for the Kia, which had Tennessee plates.

Sergeant Egan recounted that Muhammad began looking in an extremely awkward manner for the rental agreement in the center console, glove compartment and under the seats. The Sergeant became "very nervous" because Muhammad was "leaning his body down and doing something I couldn't see . . . either reaching for or doing something to hide

- 3 -

what he was worried about me seeing in the center console." (**Id.** at 25). Because Muhammad was twisting his body in an uncomfortable and unnatural way, it made the Sergeant "feel as if there was something that could be dangerous" to him, especially because he was not wearing a bullet proof vest or carrying a taser gun. (**Id.** at 26). When Muhammad found and gave the rental agreement to the Sergeant, he walked to the back of his police vehicle to create distance because the situation "absolutely" fell within the warning signs he had been trained to look for. (**Id.** at 27). As he waited for backup, two Upper Providence officers offered assistance.

Sergeant Egan re-approached the Kia and Muhammad complied with his request to exit the car. Sergeant Egan patted him down for weapons, found none, and asked what was going on. Muhammad explained that he was a "Monster Hack" driver functioning similarly to an Uber driver and that he is paid in cash. He then contradicted himself by stating that it was not a cash business. Sergeant Egan became increasingly suspicious at the details of Muhammad's explanation and directed him to stand with the other officers. He conducted a limited search of the Kia "to make sure there were no weapons or anything right around the driver's compartment" and looked under the seat and in the center console where he recovered a handgun and checks. (**Id.** at 31).

Sergeant Egan exited the Kia and informed Muhammad that he was being detained because of the gun and the ongoing situation at the bank.

When Sergeant Egan asked Muhammed to place his hands behind him, Muhammed shoved him in the chest and attempted to flee. A struggle ensued between Muhammad and four officers who assisted Sergeant Egan in detaining him. Muhammad was tased and placed under arrest. Muhammad's co-defendants were also arrested and the Kia Soul was searched after police obtained a warrant. Muhammad admitted to driving the two other individuals to the bank, and Sergeant Egan testified that in his experience, it is "extremely common" in investigating fraudulent checks for a group of people to work in concert to defraud the bank. (*Id.* at 36).

On cross-examination, Sergeant Egan clarified that he had his police badge displayed as he approached the Kia, and that there was no mention of the Tennessee license plate as a descriptive indicator of the car in the 911 call. The Sergeant reiterated that during the 911 call, the bank manager had indicated that the female suspect in the bank was going back and forth to a gray Kia Soul. (*See id.* at 39). Sergeant Egan also noted that as he initially approached the bank, he looked for a Kia Soul, and that he pulled in behind the only make and model of that vehicle in the vicinity. The Sergeant acknowledged that once he parked in back of the Kia, Muhammad was not free to leave. (*See id.* at 45). The trial court deferred ruling on the motion pending the submission of briefs. It denied the motion on October 17, 2019.

**B.**

Muhammad filed a motion to reconsider the suppression ruling on February 11, 2021, in light of our Supreme Court's decision in ***Commonwealth v. Alexander***, 243 A.3d 177 (Pa. 2020). The ***Alexander*** Court addressed the requirements under the Pennsylvania Constitution of the automobile exception to the warrant requirement.[2] The trial court denied the motion after considering the parties' briefs.

At Muhammad's October 13-14, 2021 jury trial, the Commonwealth presented evidence showing that Muhammad did not have a license to carry a firearm and that Muhammad's struggle during his arrest caused a bleeding laceration to Sergeant Egan's nose. (***See*** N.T Trial, 10/13/21, at 119, 141). Muhammad's father, Gerald Clark, testified for the defense. He indicated that his brother, co-defendant Henry Clark, carried a firearm for protection when he was alive. (***See*** N.T Trial, 10/14/21, at 42-43).

_____

[2] The ***Alexander*** Court held that Article I, Section 8 of the Pennsylvania Constitution requires both a showing of probable cause and exigent circumstances to justify a warrantless search of an automobile. ***See Alexander***, ***supra*** at 181, overruling ***Commonwealth v. Gary***, 91 A.3d 102 (Pa. 2014) (requiring only probable cause). However, as discussed ***infra***, the instant case does not involve a full interior vehicle search pursuant to the automobile exception and instead concerns a limited protective search for officer safety.

As previously noted, Muhammad was also charged with person not to possess a firearm under 18 Pa.C.S. § 6105[3] at Count 4. To avoid informing the jury of his prior convictions, the parties and the trial court agreed to submit the following question to the jury on the verdict sheet for that offense (instead of a guilty/not guilty option):

**IV. Possession of Firearm**

Did the Defendant Rasheed Muhammad on December 18, 2018 possess and have under his control a firearm, to wit a Smith & Wesson 38 Caliber Special?

(Verdict Sheet, 10/14/21). The jury answered "No" to this question, but nonetheless found Muhammad guilty of firearms not to be carried without a license. It also found him guilty of resisting arrest. On November 30, 2021, the trial court sentenced Muhammad to an aggregate term of 42 to 84 months' incarceration followed by two years of probation. The trial court denied Muhammad's post-sentence motion on December 6, 2021, and he timely appealed. Muhammad and the trial court complied with Rule 1925. *See* Pa.R.A.P. 1925(a)-(b).

---

[3] The Crimes Code defines this offense as follows: "A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth." 18 Pa.C.S. § 6105.

**II.**

Muhammad first challenges the trial court's denial of his suppression motion and raises a two-fold argument contesting both the initial stop of the Kia and the warrantless search of its center console. (***See*** Muhammad's Brief, at 1-12).[4] Muhammad contends Sergeant Egan lacked reasonable suspicion to stop his vehicle where the 911 caller provided only a vague description of the make, model and color of the car, and the color of his Kia did not match that description (*i.e.*, it was blue instead of gray). According to Muhammad, Sergeant Egan stopped him "based on a mere hunch" because there was no evidence linking his vehicle to the individuals who had been detained inside of the bank. (***Id.*** at 5, 7). Regarding the search of the center console, Muhammad disputes its validity by arguing there was no evidence that he was

_____

[4] When reviewing an order denying a motion to suppress evidence,

> [w]e may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. An appellate court, of course, is not bound by the suppression court's conclusions of law. It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony.

***Commonwealth v. Luczki***, 212 A.3d 530, 542 (Pa. Super. 2019) (citations omitted).

armed or dangerous and that there were no exigent circumstances to justify a warrantless search. (*See id.* at 1, 10-12).

**A.**

We begin by addressing the legality of Sergeant Egan's stop of the Kia and observe:

> The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution guarantee the right of the people to be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures. To secure the right of citizens to be free from unreasonable search and seizure, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty. Because interactions between law enforcement and the general citizenry are widely varied, search and seizure law looks at how the interaction is classified and if a detention has occurred.

*Luczki*, *supra* at 542 (case citations omitted).

> The law recognizes three distinct levels of interaction between police officers and citizens: (1) a mere encounter; (2) an investigative detention, often described as a *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1, (1968); and (3) a custodial detention.
>
> A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond and therefore need not be justified by any level of police suspicion.
>
> In contrast, an investigative detention carries an official compulsion to stop and respond. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity.
>
> Finally, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent

of an arrest. This level of interaction requires that the police have probable cause to believe that the person so detained has committed or is committing a crime.

*Commonwealth v. Jefferson*, 256 A.3d 1242, 1247-48 (Pa. Super. 2021), *appeal denied*, 268 A.3d 1071 (Pa. 2021) (most citations omitted).

In this case, Muhammad was subjected to an investigative detention when Sergeant Egan pulled his police vehicle directly behind the Kia, effectively blocking it in. In determining whether the Sergeant had reasonable suspicion to initiate an investigative detention:

> . . . the fundamental inquiry is an objective one, namely, whether the facts available to police at the moment of the intrusion warrant a man of reasonable caution in the belief that the action taken was appropriate. Reasonable suspicion is dependent on both the quantity and quality of the information police possess prior to detaining an individual. In order to assess the facts available to police, we must consider the totality of the circumstances. While reasonable suspicion is a less stringent standard than probable cause, the detaining officer must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.

*Id.* at 1248 (citations and quotation marks omitted).

A consideration the totality of the circumstances includes such factors as tips, the reliability of any tips, location and suspicious activity. *See Commonwealth v. Mackey*, 177 A.3d 221, 229 (Pa. Super. 2017). Importantly, identified citizens who report their observations of criminal activity to police, as was the case here with the PNC Bank manager, are assumed to be trustworthy, since a known informant places himself at risk of prosecution for filing a false claim if the tip is untrue, whereas an unknown

informant faces no such risk. *See Commonwealth v. Walls*, 206 A.3d 537, 542 (Pa. Super. 2019).

The trial court concluded that the stop was lawful and explained:

The record is clear this is a case of police in the initial stages of a felony criminal investigation who were looking for a Kia Soul in the vicinity of the PNC Bank and upon arrival, they observed a Kia Soul parked in a parking spot across from the PNC Bank. While the description of a gray Kia Soul may be incorrect as to the precise color, the factual discrepancy does not mean it did not accurately describe the make and model of the vehicle subject to the call, and its location . . . and this court's acknowledgment that grays and blues can appear similar, especially from a distance. Additionally, the record shows as Egan approached the area of the PNC Bank he was looking for the presence of a Kia Soul, and the only one in the area was located exactly in the place the caller indicated, *i.e.*, across from the PNC Bank. Recognizing that this description was provided by a witness who was observing and reporting from inside the PNC Bank and across the street from the Kia Soul . . . the color discrepancy is of *de minimus* import[.]

Concerning the allegation there was no reasonable suspicion to stop even the correct Kia Soul because the information in the radio call did not indicate that any criminal activity was ongoing that involved the Kia Soul, the record is clear one of the persons involved in the criminal activity in the PNC Bank walked out to the Kia Soul and returned to the PNC Bank. Additionally, Egan's testimony during the suppression motion revealed that in these types of crimes "it is common practice for there to be a group of people that do these scams." Based on the report, an investigation by the police of the only Kia Soul in the area was legal, and contrary to Appellant's allegation, police had reasonable suspicion to investigate a report of felonies in progress especially when Egan observed a Kia Soul located in the same place identified by the caller who indicated one of the persons involved in the ongoing criminal episode walked out to the Kia Soul and came back into the bank and Egan testified there were no other Kia Soul vehicles in the area.

(Trial Court Opinion, 3/28/22, at 9-10) (record citations omitted).

Considering the totality of the circumstances, including Sergeant Egan's decades-long training and experience, along with the fact that the 911 call was placed by an identified eyewitness to a suspected felony in progress, we conclude that he had reasonable suspicion to initiate the stop of the Kia. Muhammad's claim to the contrary warrants no relief.

**B.**

We next address the warrantless limited search of the Kia, which Muhammad claims was illegal. As a general rule, a warrantless search of a vehicle requires both probable cause and exigent circumstances. *See Alexander*, *supra* at 181. However, in *Michigan v. Long*, 463 U.S. 1032 (1983), the United States Supreme Court applied the principles set forth in *Terry* to a search of the passenger compartment of a vehicle for weapons. Long was convicted of possession of marijuana found by police in the passenger compartment. The *Long* Court held that the "search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* at 1049. "The issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 1050.

- 12 -

"If a suspect is 'dangerous,' **he is no less dangerous simply because he is not arrested**." *Id.* (emphasis added). "In evaluating the validity of an officer's investigative or protective conduct under *Terry,* the touchstone of our analysis is always the reasonableness in all circumstances of the particular governmental intrusion of a citizen's personal security." *Id.* at 1051. "Therefore, the balancing required by *Terry* clearly weighs in favor of allowing the police to conduct an area search of the passenger compartment to uncover weapons, as long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous." *Id.* The *Long* court also emphasized that a *Terry* investigation is "at close range, when the officer remains particularly vulnerable in part **because** a full custodial arrest has not been effected, and the officer must make a quick decision as to how to protect himself and others from possible danger." *Id.* at 1052 (citation omitted; emphasis original).

Here, the trial court concluded that the warrantless limited search of the Kia was reasonable and stated:

> Appellant's version is a clean, laundered version of the actual events from December 18, 2018 as evidenced by the record from the suppression hearing. . . . With police already on notice to the criminal activity, Appellant conducted himself in a manner which in itself was suspicious. As soon as the police pulled behind the only Kia Soul in the location reported on the call, Appellant put the car into reverse as if to leave, and then Appellant asked Egan whether he was parked legally. Then, in front of Egan he furtively moved about the inside of the vehicle blocking Egan's view of the console area. Egan has been a police officer for many years and knowing he was investigating a report of a felony in progress, his suspicions became heightened as a result of all of Appellant's

- 13 -

behaviors. . . . Egan's testimony at the suppression hearing is clear he was in plainclothes without a bulletproof vest and his suspicion was aroused since he already was investigating the active commission of felony crimes, he detected the overwhelming odor of marijuana from Appellant and the vehicle, and he observed Appellant who was the driver of the vehicle reported in the call engaging in a course of conduct, including initially pulling his vehicle in reverse as if to leave and then blocking from view certain areas of the inside of the vehicle with his surreptitious movements.

(Trial Ct. Op., at 11-12) (record citations omitted).

Based on the foregoing, we conclude the record contains ample evidence supporting Sergeant Egan's belief that Muhammad posed a danger if he were permitted to reenter the vehicle. The officers here, as in **Long**, did not act unreasonably in taking preventative measures to ensure their safety. Sergeant Egan specifically testified that Muhammad's behavior made him "feel as if there was something that could be dangerous" to him, especially because he was not wearing a bullet proof vest or carrying a taser, and that his interaction with Muhammad "absolutely" signaled to him based on his training and experience that Muhammad was potentially armed and dangerous. (**See** N.T. Suppression, at 26-27). The search of the car was restricted to those areas that Muhammad would have immediate control of and could contain a weapon. Thus, the intrusion was "strictly circumscribed by the exigencies

which justified its initiation." ***Long***, ***supra*** at 1051 (citation omitted).

Muhammad's suppression issue merits no relief.[5]

## III.

Muhammad next challenges the sufficiency of the evidence supporting

his firearms not to be carried without a license and resisting arrest convictions.

(***See*** Muhammad's Brief, at 12-25).[6]  Regarding the firearms not to be carried

---

[5] Muhammad's reliance on ***Commonwealth v. Cartagena***, 63 A.3d 294 (Pa. Super. 2013) (*en banc*), which involved a Commonwealth appeal from an order **granting** suppression of a firearm seized from the center console during a traffic stop, is misplaced. (***See*** Muhammad's Brief, at 9-11).  In that case, police stopped Cartagena late at night for a tinted windows violation and he exhibited nervousness while complying with the officers' orders to lower the windows and produce license, insurance and registration information.  This Court considered the legality of the warrantless protective sweep of his vehicle under ***Long***, and determined that the sparse record lacked articulable facts that would warrant reversal of the suppression ruling.  ***See Cartagena***, ***supra*** at 303, 307.  The Court observed that the "suppression hearing transcript contains **no information** about Officer Johncola's level of training or experience in conducting traffic stops (or even years of service) and **is devoid of any testimony** that Officer Johncola believed, based on his training and experience, that Cartagena possessed a weapon or had access to a weapon in his vehicle, . . . or that he made any movements that caused Officer Johncola to believe that Cartagena was in possession of a weapon or that Cartagena posed a safety threat." ***Id.*** at 302-303 (citing, *e.g.*, ***Terry*** and ***Long***) (emphasis added).  In contrast, in the instant case, the record contains significant information detailing Sergeant Egan's training and firsthand experience in identifying persons potentially armed and dangerous and his testimony that Muhammad's furtive and awkward movements indicated that he was a safety threat.

[6]

> When reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient

*(Footnote Continued Next Page)*

without a license conviction (Count 5), he contends that it must be vacated because "the jury specifically found that [he] did not constructively possess the weapon" on the question submitted to it for Count 4. (*Id.* at 15). Muhammad also disputes the element of constructive possession where the evidence showed that the two people involved in the check cashing scheme had also been in the Kia. (*See id.* at 24). Concerning the resisting arrest offense, Muhammad maintains that because everything leading up to the "brief struggle" with police was unconstitutional, there was no lawful arrest to support the conviction. (*See id.* at 12, 21).

## A.

We first address the sufficiency of the evidence supporting Muhammad's firearms conviction. "In order to convict a defendant for carrying a firearm without a license, the Commonwealth must prove that the weapon was a firearm; that the firearm was unlicensed; and that where the firearm was concealed on or about the person, it was outside his home or place of

---

to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to accord to each witness's testimony and to believe all, part or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

*Commonwealth v. Steele*, 234 A.3d 840, 845 (Pa. Super. 2020) (citations omitted).

- 16 -

business." ***Commonwealth v. Hewlett***, 189 A.3d 1004, 1009 (Pa. Super. 2018). A defendant's possession of the firearm must also be established by the Commonwealth. ***See Commonwealth v. Boatwright***, 453 A.2d 1058, 1059 (Pa. Super. 1982). Because the gun in the instant case was found in the center console of the vehicle and not on Muhammad's person, the concept of constructive possession applies.

> Where a defendant is not in actual possession of the prohibited items, the Commonwealth must establish that the defendant had constructive possession to support the conviction. Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. We have defined constructive possession as conscious dominion, meaning that the defendant has the power to control the contraband and the intent to exercise that control. To aid application, we have held that constructive possession may be established by the totality of the circumstances.

> It is well established that, as with any other element of a crime, constructive possession may be proven by circumstantial evidence. In other words, the Commonwealth must establish facts from which the trier of fact can reasonably infer that the defendant exercised dominion and control over the contraband at issue.

> To find constructive possession, the power and intent to control the contraband does not need to be exclusive to the appellant . . . and may be found in one or more actors where the item in issue is in an area of joint control and equal access.

***Commonwealth v. Rojas-Rolon***, 256 A.3d 432, 437–38 (Pa. Super. 2021), *appeal denied*, 2022 WL 4590477 (Pa. filed Sept. 30, 2022) (citations omitted).

Here, Sergeant Egan recovered the gun from the center console of the Kia, right next to where Muhammad had been sitting. Muhammad was the

only occupant in the car at the time of the stop, and his furtive movements and awkward positioning of his body indicated that he was aware of the gun and was attempting to conceal it. The jury could reasonably infer from Muhammad's proximity to the gun and his efforts to conceal it that the gun belonged to him. Given that Muhammad had no license to carry a firearm, and viewing the evidence presented at trial in the light most favorable to the Commonwealth, the evidence was sufficient to support his conviction.

With regard to Muhammad's claim the jury's answer of "No" to the interrogatory regarding possession of the firearm at Count 4 invalidated its verdict on Count 5, we disagree. It is well-settled that consistency in a verdict is not required and that inconsistencies are generally not reviewable because they would involve speculation or require investigation into the jury's deliberations. **See Commonwealth v. Widger**, 237 A.3d 1151, 1160 (Pa. Super. 2020), *appeal denied*, 249 A.3d 505 (Pa. 2021). Additionally, criminal defendants are already afforded protection against jury irrationality or error by independent review by our Courts of the sufficiency of the evidence. **See id.** at 1161.

Our decision in **Commonwealth v. Banks**, 253 A.3d 768 (Pa. Super. 2021), *appeal denied*, 267 A.3d 1213 (Pa. 2021), is instructive. The defendant in that case was convicted of DUI—general impairment and fleeing or attempting to elude a police officer. Although the latter crime is generally graded as a second-degree misdemeanor, it constitutes a third-degree felony

if, while fleeing, the defendant is DUI. **See id.** at 775. On the verdict slip, the jury was asked for the fleeing/eluding charge to first indicate whether Banks was guilty or not guilty. It was then queried, if the finding was guilty, whether the Commonwealth had proved beyond a reasonable doubt that Banks, while fleeing, had committed a violation of the DUI statute. The jury answered "No" to this question. On appeal, Banks contended that this "No" finding on the fleeing/eluding charge impacted the sufficiency analysis for the DUI offense. We disagreed and held that "the fact that the jury simultaneously convicted Appellant of DUI and found that Appellant was not DUI in connection with the fleeing/eluding charge is of no moment." **Id.** We explained:

> **[I]nconsistent verdicts, while often perplexing, are not considered mistakes and do not constitute a basis for reversal**. Consistency in verdicts in criminal cases is not necessary. When an acquittal on one count in an indictment is inconsistent with a conviction on a second count, the court looks upon the acquittal as no more than the jury's assumption of a power which they had no right to exercise, but to which they were disposed through lenity. Thus, this Court will not disturb guilty verdicts on the basis of apparent inconsistencies **as long as there is evidence to support the verdict**. The rule that inconsistent verdicts do not constitute reversible error applies even where the acquitted offense is a lesser included offense of the charge for which a defendant is found guilty.

**Id.** (citation omitted; emphasis added).

Instantly, as discussed above, there was sufficient evidence of record to convict Muhammad of carrying a firearm without a license. Further, the verdict sheet providing the interrogatory concerning Count 4 did not connect in any manner that charge to the separate offense at Count 5. The record

reflects that the trial court and the parties **agreed** to submit the question at Count 4 to the jury as a means of protecting Muhammad from potential prejudice, because listing all of the elements of the person not to possess in that count would have required informing the jury of his prior offenses. The apparent inconsistency in the verdict here, as in **Banks**, is not considered a mistake and does not constitute a basis for reversal. **See Banks**, **supra** at 775. For all of the foregoing reasons, Muhammad's sufficiency challenge to the firearms conviction merits no relief.

**B.**

Last, we address Muhammad's claim that the evidence was insufficient to support his conviction for resisting arrest. A person is guilty of resisting arrest if he "with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty . . . creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance." 18 Pa.C.S. § 5104. "A valid charge of resisting arrest requires an underlying lawful arrest, which, in turn, requires that the arresting officer possess probable cause" to make the arrest. **Commonwealth v. Clemens**, 242 A.3d 659, 666 (Pa. Super. 2020) (citation omitted).

Muhammad does not dispute that he resisted the officers or that they used substantial force to overcome him. Instead, he challenges the lawfulness of his arrest based on the invalidity of the stop and search of the Kia. (**See**

Muhammad's Brief, at 12, 21). This argument is meritless because, as discussed above, Sergeant Egan had reasonable suspicion to stop the Kia as part of the ongoing felony investigation and the limited protective sweep of the vehicle was reasonable. The discovery of the firearm in the center console of the car gave police probable cause to arrest Muhammad. Muhammad's efforts to prevent the police from restraining him by shoving Sergeant Egan and struggling with multiple officers to the point where use of a taser was necessary to subdue him provides sufficient evidence to sustain his conviction.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/9/2023