J-S12018-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GEOVONNE HOLMES | : | No. 1730 MDA 2022 |

Appeal from the Order Entered November 21, 2022
In the Court of Common Pleas of Berks County Criminal Division at
No(s):  CP-06-CR-0002255-2021

BEFORE:   KUNSELMAN, J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY McCAFFERY, J.:                **FILED: OCTOBER 12, 2023**

The Commonwealth appeals from the order entered in the Berks County Court of Common Pleas, granting the omnibus pretrial motion filed by Geovonne Holmes (Appellee).[1]  The trial court suppressed evidence of a firearm recovered following a vehicle search and dismissed four charges filed against Appellee.  On appeal, the Commonwealth argues the trial court erred when it suppressed the firearm recovered pursuant to a protective sweep, and the court's dismissal of the charges was premature.  Because we conclude the protective sweep of Appellee's vehicle was based upon a reasonable suspicion

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] In its notice of appeal, the Commonwealth certified that the ruling "terminated or substantially handicaps the prosecution of this case" pursuant to Pa.R.A.P. 311(d).  **See** Commonwealth's Notice of Appeal, 12/14/22.

that Appellee might be armed, we reverse the order on appeal and remand for further proceedings.

The trial court summarized the facts underlying Appellee's arrest, as presented during the pretrial hearing, as follows:

> On June 17, 2021, Officer Christopher Fortin of the West Reading Police Department was performing a traffic check in his marked police vehicle at 6th and Franklin in West Reading.
>
> At approximately 3:20 in the afternoon, Office Fortin ran the registration of a vehicle that was being driven by a male driver. When he ran the registration of this particular vehicle, he discovered that the registered owner had an open warrant for a [driving under the influence] matter.[7]  Officer Fortin activated his lights and siren and initiated a traffic stop in order to determine whether the driver was the "wanted" owner of the vehicle.  Upon exiting his vehicle, Officer Fortin approached on the passenger side of the vehicle.  Upon approach, he observed a female sitting in the passenger seat, an adult male in the driver's seat, and a young child in the rear seat.

_____

> [7] Officer Fortin testified that the scan showed the registered owner of the vehicle to be an individual with the name of "Miguel Guzman Verdejo."  He also testified that he did not observe any other traffic violations.

_____

> Officer Fortin testified that the male driver appeared to be sweating profusely and was "canted" away from the officer in a manner as to hide his left hip.[8]  Officer Fortin also described the female passenger being approximately eight (8) months pregnant with a "really big pregnant belly."  He also noticed that she was wearing a bathing suit.

_____

> [8] In [its] Concise Statement, the Commonwealth uses the word "blading" when describing the physical position of [Appellee's] body upon Officer Fortin's initial approach.  The record is devoid of any such phrase.  A more appropriate

- 2 -

synonym for "canted" is tilted or slanted. Oxford English Dictionary, Oxford University Press, Copyright ©2023.

_____

Officer Fortin asked the driver for his documentation to which the driver responded that it was a friend's car. The driver could not give the officer the name of the "registered owner."[9] The driver did not have a driver's license or any other documents with his name on it. Officer Fortin asked the driver for his name and date of birth. At this time, the driver identified himself as [Appellee] Geovonne Holmes, with a date of birth of August 25, 1998. Officer Fortin took this information and returned to his vehicle in an attempt to identify the driver. Officer Fortin used the radio to call in the information. He also ran the name and date of birth through the [National Crime Information Center (NCIC)] and [Pennsylvania Justice Network (JNET)] systems. Despite these efforts, Officer Fortin was not able to positively identify the driver.

_____

[9] Despite the driver's initial "canted" position, he was cooperative and answered all of Officer Fortin's questions.

_____

Officer Fortin testified that he was in his vehicle for "a good 45 seconds." During this time period, Officer Fortin testified that he "periodically" looked up and observed a "good amount of movement" between the driver and the passenger. Notably, Officer Fortin did not observe any hand movements, leaning down or hand transactions. Rather, he only saw heads moving.

Officer Fortin exited his police cruiser and reapproached the vehicle — this time on the driver's side — to ask the driver to confirm the spelling of his name and his date of birth. When he arrived at the driver's side window, Officer Fortin stated that [Appellee] was sweating and both arms were "stiff" on the steering wheel.[10] Additionally, he observed the female passenger was putting on shorts over her bathing suit. Officer Fortin stated that when he saw the "very pregnant" female passenger putting on shorts, he became suspicious that she was "attempting to conceal something."[11] Officer Fortin could not articulate any particular reason for his suspicion other than to say that merely putting on shorts during a traffic was "suspicious in general" to him. Officer Fortin testified that he did not know what they were concealing but, whatever it may have possibly been, it put him in fear for his safety. Despite his alleged "fear," Officer Fortin

confirmed with the driver the spelling of his name and the date of birth. Officer Fortin left the vehicle to return to his cruiser.

_____

[10] On cross-examination, Officer Fortin stated that only one hand was on the wheel while the other arm was on the side panel.

[11] Officer Fortin attempted to buttress his suspicion by stating that he found the manner in which she was attempting to put the shorts on — with one hand in the back and one in the front — to be "very odd to [him]." On cross[-]examination, Officer Fortin testified that he did not know what it is like to get dressed while being eight or nine months pregnant.

_____

By this time in the traffic stop, Officer Thomas Hawn of the West Reading Police Department had arrived on scene and was positioned on the passenger side of the vehicle by the rear panel. Officer Hawn testified that when he arrived on the scene, Officer Fortin was standing by the driver's door and that the passengers were still in the vehicle. Officer Hawn further stated that when he first got there, Officer Fortin told him that he did not know the name of the driver and that he "wanted to get (the driver) out of the car and take a look inside the car." Officer Hawn stated that Officer Fortin told him the reason he wanted to get the driver out and search was "because he didn't believe the driver was who he was saying and he didn't have identification."

Officer Fortin returned to his cruiser and ran [Appellee's] name in the CODY [record management] system — a system designed to identify persons in the local area. The CODY system was able to identify a person with the name of Geovonne Holmes with the date of birth that was provided by the driver. Officer Fortin testified that the CODY system showed "a prior contact" with Geovonne Holmes "where he was in possession of a firearm." Officer Fortin was unable to provide any details about the "prior contact" (nature of charges, allegations, case outcome) as he did not have access to a criminal complaint. There was also no picture of the individual associated with the prior contact. After finding this information in CODY, Officer Fortin acknowledged that he was still unable to positively identify the driver.

After finding information about a "prior contact," Officer Fortin testified that "at this point due to everything I had observed

- 4 -

and the prior weapons offense, I was under the impression there was possibly a firearm in the vehicle that they were attempting to conceal . . . ." Officer Fortin later acknowledged that he did not know what was being concealed.

Officer Fortin returned to the vehicle a third and final time and "had the driver exit." Once [Appellee] was out of the vehicle, Officer Fortin conducted a pat down search "with the intent to conduct a wing span search of the vehicle." [Appellee] was brought to the rear of the vehicle and was left with Officer Hawn at the trunk area.

Officer Fortin then approached the passenger and asked her if she was concealing anything. She told him she was not. Officer Fortin then had the passenger exit the vehicle. When the passenger got out of the vehicle, Officer Fortin noticed a closed, black fanny pack laying on the floorboard. Officer Fortin reached into the vehicle and grabbed the fanny pack. When he grabbed the fanny pack, Officer Fortin felt the butt of a firearm. Officer Fortin set the fanny pack down, reapproached [Appellee] and the passenger at the rear of the vehicle. Officer Fortin stated that he detained [Appellee] at that time.

Officer Fortin returned to the fanny pack and opened it. Inside was a black Walther .380 pistol and a bank (debit) card with [Appellee's] name engraved on the card.[12] [Appellee] was taken into custody where his identity as Geovonny Holmes and his date of birth were confirmed as being accurate. The female passenger was not detained. It was later learned that the firearm was reported stolen out of Cumru Township, Berks County, in October of 2020. Additionally, [Appellee] did not possess a license to carry a firearm.

_____

[12] An unidentified amount of cash was also located in the "fanny" pack. This was given to the female passenger.

_____

At no point did Officer Fortin ask for permission to search the vehicle. He did not seize the vehicle. He did not apply for a warrant and he did not identify anything of an illegal nature in plain view at any point during his interactions with [Appellee] and the female passenger.

Trial Ct. Op. 1/18/23, at 3-7 (record citations omitted).

Appellee was arrested and charged with persons not to possess a firearm, possession of a firearm without a license, theft, receiving stolen property, driving while operating privilege is suspended, and operation of vehicle without official certificate of inspection.[2] On September 29, 2021, Appellee filed an omnibus pretrial motion, seeking suppression of the firearm recovered from the warrantless search of the fanny pack, and dismissal of the firearms and theft charges. **See** Appellant's Omnibus Pretrial Motion, 9/29/21, at 2-3 (unpaginated).

The trial court conducted a pretrial hearing on November 3, 2022, at which time the Commonwealth presented the testimony of Officers Fortin and Hawn. Appellant did not call any witnesses or present any evidence. On November 21st, the trial court entered an order, accompanied by Findings of Fact and Conclusions of Law, granting both Appellee's suppression motion and writ of *habeas corpus* with regard to the firearms and theft charges. **See** Order, 11/21/22. This timely Commonwealth appeal follows.[3]

The Commonwealth presents two issues for our review:

A. Did the trial court err in suppressing the items seized from the fanny pack as part of the protective sweep of the vehicle because under the totality of the circumstances the police officer had reasonable suspicion to believe the occupants were

_____

[2] **See** 18 Pa.C.S. §§ 6105(a)(1), 6106(a)(1), 3921(a), 3925(a), and 75 Pa.C.S. §§ 1543(a), 4703(a), respectively.

[3] The Commonwealth complied with the trial court's directive to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

armed and dangerous based on all of the officer's observations and experience?

B. Did the trial court err in granting the request for a writ of *habeas corpus* without permitting the Commonwealth to appeal from the adverse suppression ruling?

Commonwealth's Brief at 4.

The Commonwealth's first issue challenges the trial court's grant of Appellee's suppression motion. Our review of a suppression order is limited to determining "whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate." ***Commonwealth v. Cartagena***, 63 A.3d 294, 298 (Pa. Super. 2013) (*en banc*) (citations omitted). Where, as here,

> [the defendant] prevailed in the suppression court, we may consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. However, where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

***Id.*** (citations omitted).

Generally, the warrantless search of a vehicle requires the Commonwealth to establish both probable cause and exigent circumstances. ***See Commonwealth v. Alexander***, 243 A.3d 177, 181 (Pa. 2020). However, in ***Michigan v. Long***, 463 U.S. 1032 (1983), the United States

Supreme Court extended the principals of a limited *Terry*[4] frisk "to a search of the passenger compartment of a vehicle for weapons."[5] *Commonwealth v. Muhammad*, 289 A.3d 1078, 1088 (Pa. Super. 2023). The *Long* Court held:

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses **a reasonable belief based on specific and articulable facts** which, taken together with the rational inferences from those facts, **reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons**. [T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. If a suspect is dangerous, he is no less dangerous simply because he is not arrested. . . .

*Long*, 463 U.S. at 1049-50 (footnote, citations & quotation marks omitted; emphases added).

The Supreme Court emphasized that "roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect." *Long*, 463 U.S. at 1049. An investigative detention during a vehicle stop "involves a police investigation 'at close range,' when the officer remains particularly

---

[4] *Terry v. Ohio*, 392 U.S. 1 (1968).

[5] We refer to this type of search, interchangeably, as a "protective sweep," a "protective search," or a "wingspan search." *See Muhammad*, 289 A.3d at 1092 ("protective sweep"); *Commonwealth v. Arrington*, 233 A.3d 910, 922-23 (Pa. Super. 2020) (Bowes, J. dissenting) ("wingspan search," "protective sweep," and "protective search"); *Cartagena*, 63 A.3d at 296, 301 ("protective sweep" and "protective search").

vulnerable in part **because** a full custodial arrest has not been effected, and the officer must make a 'quick decision as to how to protect himself and others from possible danger[.]'" **Id.** at 1052, *citing* **Terry**, 392 U.S. at 24, 28. Moreover, "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." **Long**, 463 U.S. at 1052. When considering whether a police officer had the requisite reasonable suspicion to be concerned for their safety, we must not view the facts in isolation "but in light of the totality of the circumstances[.]" **Cartagena**, 63 A.3d at 304.

In the present case, the Commonwealth insists the trial court erred when it suppressed the firearm recovered from the fanny pack in Appellee's vehicle after a protective sweep. **See** Commonwealth's Brief at 11. It relies upon the following "reasonable and articulable facts" to support its claim that Officer Fortin had the requisite reasonable suspicion to be concerned for his safety: (1) Appellee was unable to provide a driver's license or proof of his identity and did not know whose car he was driving; (2) although Appellee provided the officer with his name and date of birth, he "misspelled" his first name; (3) while interacting with the officer, Appellee was "sweating profusely, and his movements were rigid, showing his extreme nervousness[;]" (4) Appellee positioned his hips "angled away from him towards the seat" in a "contorted position" that the officer found to be suspicious; (5) the officer observed "a good amount of movement" — more than he normally observes — "between the front seat female and [Appellee] when he look up periodically"

as he ran Appellee's name and date of birth; (6) when the officer returned to the vehicle, Appellee was "sweatier than before . . . and his arms were even more rigid" and the female passenger was putting on shorts over her bathing suit; and (7) a search of the local police database "showed that [Appellee] had a prior contact [with police] where [he] was in possession of a firearm." ***Id.*** at 16-18.

The Commonwealth insists that facts presented herein are "akin" to those in ***Commonwealth v. Bozeman***, 205 A.3d 1264 (Pa. Super. 2019). ***See*** Commonwealth's Brief at 20. In ***Bozeman***, a panel of this Court reversed a trial court's order suppressing evidence (cocaine) recovered during a ***Terry*** frisk of a suspect following a vehicle stop for a minor traffic violation. ***See*** ***Bozeman***, 205 A.3d at 1276. The panel concluded the totality of the circumstances surrounding the stop "was sufficient to supply reasonable suspicion for a ***Terry*** frisk." ***Id.*** The ***Bozeman*** Court emphasized the following: (1) after he was directed to pull over, the defendant "made a furtive movement, before quickly exiting his vehicle as the officers approached[;]" (2) "he nervously fumbled for his paperwork, which he was unable to produce, [and] stood with his waist close to his vehicle as if he were concealing something in his waistband[;]" (3) the officer explained that, in his experience, "when a suspect 'blades' his body away from the officer in such a way that conceals his waistband, it is an indication the suspect 'might be armed[;]'" and (4) the officer testified he "had made 70 to 100 gun arrests and a 'high percentage' of those involved firearms in a waistband." ***Id.*** (record

citations omitted). The Commonwealth maintains that "many of those same factors are present" in this case. Commonwealth's Brief at 21.

In rejecting the Commonwealth's claim, the trial court refuted the Commonwealth's characterization of the testimony. First, the court found that Officer Fortin never testified Appellee appeared to be "extremely nervous." Trial Ct. Op. at 12 (quotation marks omitted). Rather, the officer stated Appellee was "sweating profusely[;]" the court noted that the vehicle stop occurred "in the middle of the day in June" and the female passenger was wearing a bathing suit. ***Id.***

The trial court also took issue with the Commonwealth's emphasis on the fact that Appellee appeared to take an "evasive" body stance when the officer first approached. ***See*** Trial Ct. Op. at 12. It stated that "[b]ased on [its] assessment of the testimony as it was being presented in the courtroom, [it did] not afford any significant weight to this factor." ***Id.*** The court objected to the Commonwealth's description of Appellee as evasive when Appellee answered the officer's questions and provided his correct name and date of birth. ***Id.*** at 12-13. The court stated: "In this respect, [Appellee] was not evasive but fully cooperative." ***Id.*** at 13 (footnote omitted). The trial court also pointed out that Officer Fortin "never cited [Appellee's] body position as a specific fact" supporting his reasonable suspicion — rather, the officer identified "the head movements, the female passenger putting her shorts on, and the CODY results as the basis of his suspicions." ***Id.*** (footnote omitted), *citing* N.T., 11/3/22, at 10, 12.

- 11 -

Lastly, the trial court criticized the Commonwealth's reliance on the purported 45 seconds of "furtive movements" in the vehicle. **See** Trial Ct. Op. at 13. It pointed out that Officer Fortin testified he was at his vehicle for 45 seconds — not that he was observing Appellee and the female passenger the entire time. **Id.** Rather, the court emphasized the officer testified that he "'periodically' looked up" and "only saw heads moving" — he "did not observe any hand movements, leaning down or hand transactions." **Id.** at 13-14. The court found "this periodic movement of the heads of the occupants" did not rise "to the level of furtive movements that would suggest concealment of any item that would put the officer in fear for his safety." **Id.** at 14.

Thus, the trial court concluded:

> When we view each of these . . . purported "facts" in the totality of the circumstances, it is evident that the sole intent of Officer Fortin was to remove [Appellee] from the vehicle and search the vehicle based simply on the fact that he could not identify the driver of the vehicle. This Court credits the testimony of Officer Hawn when he credibly testified that Officer Fortin told him that he "didn't know who the driver was . . . and he wanted to get him out of the car and take a look inside the car." N.T. [at] 38.
>
>           *     *     *
>
> Although [Appellee] may have been nervous during the encounter and moved while the officer was out of range, the Commonwealth did not present any facts supporting an objective belief that either individual in the vehicle presented a risk of being armed and dangerous.

Trial Ct. Op. at 14-15 (footnote omitted). Rather, the court found the facts in the present case were similar to those presented in **Arrington**, **supra**.

- 12 -

In that case, a panel of this Court determined that officers "lacked reasonable suspicion to conduct a protective weapons search of [the defendant] and the passenger compartment of his vehicle" after a traffic stop. *See Arrington*, 233 A.3d at 918. At approximately 2:00 a.m., officers observed a vehicle traveling towards them in their lane for several seconds before returning to the correct side of the road. *Id.* at 913. Suspecting the driver was under the influence of alcohol or drugs, the officers conducted a traffic stop. *Id.* Upon their approach, the officers observed the driver (the defendant) "exhibit several signs of intoxication" and when he failed to immediately respond to their request to exit the vehicle, they removed him, conducted a pat down search, and handcuffed him. *Id.* A database search of his name revealed that the defendant "had a revoked concealed-carry permit." *Id.* Although the defendant denied being in possession of a weapon, the officers searched the passenger compartment of the vehicle and recovered a handgun inside a "closed shoe box that was sitting on the vehicle's back seat." *Id.* A trial court subsequently denied the defendant's motion to suppress. *Id.*

On direct appeal, a panel of this Court concluded the officers lacked the requisite reasonable suspicion that the defendant might be armed to conduct a protective sweep of the vehicle. *See Arrington*, 233 A.3d at 918. First, the panel noted that one officer described the defendant's movements as "slow and deliberate," consistent with impaired driving, rather than "sudden, indicative of reaching for a weapon or 'furtive.'" *Id.* at 917 (record citation omitted). The panel further observed that while the defendant's actions "may

have indicated that he was nervous, the nature of [his] actions [did] not support a conclusion that he was in possession of a weapon." *Id.* Finally, the panel stated that the defendant was "in handcuffs, positioned at the rear of his vehicle, out of reach of the passenger compartment, and being supervised" by another officer when the search occurred; thus, he "posed no threat to the officers' safety." *Id.* at 917-18. Accordingly, the *Arrington* panel reversed the judgment of sentence with regard to the offenses stemming from the search.

Turning to the present matter, our review of the testimony presented at the suppression hearing, confirms that some of the trial court's factual findings are not supported by the record. *See Cartagena*, 63 A.3d at 298. Moreover, we conclude the trial court reviewed the factors cited by the Commonwealth in isolation, rather than, as required, "in light of the totality of the circumstances[.]" *See id.* at 304.

Preliminarily, we emphasize it is undisputed that, when stopped by Officer Fortin, Appellee was unable to provide a driver's license or documentation with proof of his identity, nor was he able to name the owner of the vehicle. *See* N.T. at 6-7. These circumstances first raised the officer's suspicion. *See id.* at 6 ("Right out of the gate, he was very suspicious to me. He didn't know whose vehicle it was."). However, we agree that these facts alone do not support a reasonable belief that Appellee may be armed.

The trial court disputes three "facts" the Commonwealth relies upon to support its claim that Officer Fortin possessed a reasonable suspicion that Appellee might be armed — (1) Appellee demonstrated "extreme nervousness;" (2) Appellee was evasive with the officers; and (3) Appellee made "furtive movements" in his vehicle. **See** Trial Ct. Op. at 11-14 (internal quotation marks omitted). We address the court's concerns seriatim.

First, the court first takes issue with the Commonwealth's description of Appellee as having "exhibited 'extreme nervousness'" based solely on the fact that he was "sweating profusely" on a summer afternoon. **See** Trial Ct. Op. at 12. While we agree Officer Fortin did not explicitly use the word "nervous" to describe Appellee, under the totality of the circumstances, it is clear that is what the officer observed. Indeed, Officer Fortin testified that when he approached the vehicle on the right passenger side and asked Appellee for his paperwork, Appellee "was sweating profusely" and moving in a "rigid" manner, while contorting his body so that his left hip faced into the seat. **See** N.T. at 7. Moreover, when the officer returned to the driver's side after first attempting to identify Appellee — and observing "a good amount of movement" in the vehicle — he noticed Appellant "continuing to be sweaty on his face and his body **more than normal**[, and that h]is arms were very stiff on the steering wheel[.]" **Id.** at 8 (emphasis added).

In its opinion, the trial court states: "A careful review of the testimony shows that neither Officer Fortin or Officer Hawn ever characterized [Appellee] as being nervous in any regard, let alone 'extremely' nervous." Trial Ct. Op.

- 15 -

at 12.  However, upon further review, it appears the court's dispute is with the Commonwealths' emphasis on the word "extremely."  Indeed, the trial court concluded that "[a]lthough [Appellee] may have been nervous during the encounter and moved while the officer was out of range, the Commonwealth did not present any facts supporting an objective reasonable belief that either individual in the vehicle presented a risk of being armed and dangerous."  **Id.** at 15 (footnote omitted).  **See also** Statement of Findings of Fact and Conclusions of Law, 11/17/21, at 7.  Thus, the court's complete disregard of Appellee's apparent nervousness was unreasonable.[6]

Second, the trial court challenges the Commonwealth's characterization of Appellee as evasive.  While we agree Appellee was cooperative with Officer Fortin in that he provided his correct name and date of birth,[7] we do **not** agree with the trial court's conclusion that this fact alone negates the officer's reasonable belief that Appellee was being evasive.  **See** Trial Ct. Op. at 12-13.

The court opined that it did not "afford any significant weight" to the fact that Appellee contorted his body away from Officer Fortin when he first

---

[6] Nevertheless, we do acknowledge, as did the trial court, that "nervousness . . . standing alone, is not sufficient to form any level of suspicion."  Trial Ct. Op. at 12, *citing* **Cartagena**, 63 A.3d at 304 n.24.

[7] The Commonwealth's focus on the spelling of Appellee's first name is a red herring.  The record does not support a finding that Appellee spelled his name incorrectly for the officer; indeed, as Appellee points out in his brief, "[t]he name and spelling that he gave law enforcement [is] the name that the Commonwealth is prosecuting him under."  Appellee's Brief at 8.

approached the vehicle. Trial Ct. Op. at 12. Rather, the court stated that Appellee was "fully cooperative" with the officer, and Officer Fortin "never cited [Appellee's] body position as a **specific fact** that he was relying on as a basis for his reasonable suspicion." *Id.* at 13 (emphasis added), *citing* N.T. at 10, 12. However, the trial court mischaracterizes the testimony. Officer Fortin testified that the way Appellee was "[c]ontorting [his] body" was "suspicious" to him and "[e]vasive." N.T. at 7. **After** learning Appellee had a prior contact with police in which he was in possession of a firearm, the officer explained: "So at [that] point due to **everything I had observed and the prior weapons offense**, I was under the impression there was possibly a firearm in the vehicle that they were attempting to conceal due to the amount of movement." *Id.* at 12 (emphasis added). Therefore, the fact that Appellee provided his correct name and date of birth to Officer Fortin did not refute the officer's belief that Appellee was being evasive. Moreover, the above cited testimony reveals Officer Fortin did consider Appellee's "evasive" body positioning as a factor supporting his belief that Appellee might be armed. Accordingly, the trial court's failure to afford any weight to this factor is not supported by the record.

Third, we conclude the trial court minimized the movement Officer Fortin observed in the vehicle. The court emphasizes that the officer "did not observe any hand movements, leaning down or hand transactions" but instead "only saw heads moving." Trial Ct. Op. at 14, *citing* N.T. at 26 (when asked under cross if he saw "anything other than their heads moving" from his

- 17 -

position, the officer replied "[n]o"). It found that "this periodic movement of the heads of the occupants [did not] rise[ ] to the level of furtive movements that would suggest concealment of any item that would put the officer in fear for this safety." Trial Ct. Op. at 14.

While the court correctly cites the officer's testimony, it ignores the context of the testimony. Officer Fortin described the "good amount of movement" he witnessed between Appellee and the female passenger as "more than [he] normally observed" in the "**thousands** of traffic stops" he has conducted. N.T. at 8 (emphasis added). He further explained: "The driver and the front-seat passenger were **both bobbing their heads**. They were **moving around side to side inside the vehicle** [which was] an **unusually high amount** of movement[.]" *Id.* at. 25 (emphases added). The court considered the movement the officer witnessed in isolation, rather than under the totality of the circumstances.

Lastly, the trial court emphasizes Officer Hawn's testimony that Officer Fortin "told him that he 'didn't know who the driver was . . . and he wanted to get him out of the car and take a look inside the car." Trial Ct. Op. at 14. The court opined that this testimony, which it found credible, undermined the Commonwealth's claim that Officer Fortin possessed reasonable suspicion that Appellee might be armed and dangerous. *See id.* However, both the United States and Pennsylvania Supreme Court have held that reasonable suspicion does not depend "on the **actual motivations** of the individual officers involved." *Whren v. United States*, 517 U.S. 806, 813 (1996) (emphasis

added); *Commonwealth v. Chase*, 960 A.2d 108, 120 (Pa. 2008). *See also*

*Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary,

probable-cause Fourth Amendment analysis."). Rather:

> With respect to determining whether there is reasonable suspicion that a suspect is armed, the [United States] Supreme Court made clear that the applicable standard is an **objective** one. [P]olice officers "need not be absolutely certain that the individual is armed" but rather the appropriate standard is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."

*Int. of T.W.*, 261 A.3d 409, 417 (Pa. 2021) (emphasis added), *citing* *Terry*,

392 U.S. at 27. Thus, the fact that Officer Fortin may have wanted to look

inside Appellee's vehicle for contraband other than a weapon was not an

appropriate factor for the court to consider when evaluating whether the

officer had **reasonable suspicion** that Appellee or his passenger may be

armed.

We conclude the facts of the present case fall somewhere between

*Bozeman* and *Arrington*. Like the defendant in *Bozeman*, Appellee acted

suspiciously after the vehicle stop. He was unable to provide any

documentation with his identification and was unable to tell the officer who

owned the vehicle. Officer Fortin noticed Appellee was very sweaty and moved

rigidly. Upon the officer's initial approach on the passenger side, Appellee

contorted his body so that his left hip was angled toward the seat away from

the officer's view. Moreover, when Officer Fortin returned to his vehicle to run

Appellant's name in the database, he noticed "a good amount of movement"

between Appellee and the female passenger, which he described as "more

than [he] normally observed [in] over the thousands of traffic stops" he had made. N.T. at 8. While the movement may have been less "furtive" than that observed in *Bozeman*,[8] we cannot categorize it as the "slow and deliberate" movement the officer observed in *Arrington*, which was more indicative of the defendant being under the influence of a controlled substance than attempting to secrete a weapon. *See Arrington*, 233 A.3d at 917. Moreover, at the time of the search in *Arrington*, the defendant was already in handcuffs — presumably based on the officers' suspicion that he was driving under the influence of a controlled substance. *See id.* at 913. Here, Appellee was not handcuffed or detained until **after** the officers recovered the firearm. *See* N.T. at 32, 34-35. Indeed, prior to their discovery of the gun, the officers had no reason to continue their investigation. *See* N.T. at 13.

Furthermore, the trial court fails to acknowledge that, in addition to Appellee's suspicious behavior, Officer Fortin also learned that Appellee had been stopped by police in the past while in possession of a firearm. This fact — omitted by the court in its analysis — supports the Commonwealth's argument that, under the **totality of the circumstances**, Officer Fortin had a **reasonable belief** that Appellee was armed and might gain control of a weapon. We agree that Appellee's movements and suspicious actions alone might not suggest he was armed. However, viewing those actions — in

---

[8] The officer in *Bozeman* saw the defendant move his head "to the left and out of sight for a few seconds before" exiting the car. *Bozeman*, 205 A.3d at 1267.

particular the hiding of left hip from the officer's view — in light of the fact that Appellee had been stopped with a weapon in the past, we conclude it was reasonable for Officer Fortin to suspect Appellee might be in possession of a weapon to justify a limited protective sweep of the passenger compartment of his vehicle, limited "to those areas in which a weapon may be placed or hidden[.]"[9]  **See Long**, 463 U.S. at 1049.

_____

[9] The Dissent insists the Commonwealth waived its present claim because it "impermissibly changed its suppression argument on appeal."  **See** Dissenting Memorandum at 1.  In its Rule 1925(b) statement, the Commonwealth framed its first issue as follows:

> The trial court erred in suppressing the items seized from the fanny pack as part of the protective sweep of the vehicle because **under the totality of the circumstances** the police officer had reasonable suspicion to believe the occupants were armed and dangerous based on the driver's extreme nervousness, the "blading" position of the driver's body on first approach, and the furtive movements lasting [45] seconds while the officer was back in his car.

Commonwealth's Concise Statement of Errors Complained of on Appeal, 1/4/23, at 1 (unpaginated) (emphasis added).

The Dissent argues that because the Commonwealth focused only on three factors to support its claim that Officer Fortin had the requisite reasonable suspicion — Appellee's nervousness, his positioning in the car, and his movements — it is limited to arguing only those three factors on appeal. **See** Dissenting Memorandum at 2, 4-5.  However, the Dissent insists the Commonwealth expanded its claim on appeal by arguing that Officer Fortin had reasonable suspicion based "all of [his] observations and experience[,]" including Appellee's failure to provide proof of his identity and prior police contact in possession of a firearm, which are factors that were not addressed, or found as fact, by the trial court.  **See id.** at 5 (citation omitted).  Thus, the Dissent concludes the Commonwealth's present claim is waived.  **See id.** at 5-6.

*(Footnote Continued Next Page)*

Accordingly, we conclude that the totality of the circumstances support Officer Fortin's limited protective sweep of Appellee's vehicle for the presence of a weapon.[10] *See Long*, 463 U.S. at 1049-50. Thus, we reverse the order of the trial court granting Appellee's suppression motion. *See Cartagena*, 63 A.3d at 298.

---

The Dissent reads the Commonwealth's Rule 1925(b) statement too narrowly. Rule 1925 requires that the statement "concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge[,]" but also provides that "[e]ach error identified in the Statement will be deemed to include every subsidiary issue that was raised in the trial court[.]" Pa.R.A.P. 1925(b)(4)(ii), (v).

Here, while the Commonwealth did point out three specific factors, it generally argued that the police had reasonable suspicion under "the totality of the circumstances." *See* Commonwealth's Concise Statement of Errors Complained of on Appeal at 1. Those circumstances include the fact that Officer Fortin had difficulty positively identifying Appellee and that Officer Fortin learned Appellee had a prior contact with police when he was in possession of a firearm. The Commonwealth emphasized these additional factors in its argument before the trial court. *See* N.T. at 49-50. Moreover, while the court did not mention Appellee's prior police contact in its findings of fact issued after the suppression hearing, it did address the fact in its subsequent opinion. *See* Trial Ct. Op. at 5. The court did not indicate that it found the officer's testimony regarding this prior police contact to be incredible. Thus, the Commonwealth did not waive our consideration of these additional factors in determining whether the "totality of the circumstances" supported Officer Fortin's reasonable suspicion that Appellee might be armed and dangerous.

[10] Although not addressed by the trial court in light of its disposition, we also conclude Officer Fortin's reasonable suspicion for the protective sweep allowed him to search inside the fanny pack. *See Commonwealth v. Morris*, 644 A.2d 721, 723-24 (Pa. 1994) (reasonable suspicion driver might be armed supported search of closed bag found vehicle "since it was large enough to hold a weapon").

In its second issue, the Commonwealth contends the trial court erred in granting Appellee's request for a writ of *habeas corpus* without first permitting it to appeal the suppression ruling. **See** Commonwealth's Brief at 21. Due to our disposition of the Commonwealth's first claim, we need not determine whether the court's ruling was premature.[11] Rather, because the trial court dismissed the firearm and theft charges based solely on its suppression of the firearm, and we have determined that suppression ruling was erroneous, we also reverse the order granting Appellee's motion for writ of *habeas corpus*.

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

Judge Colins joins the Memorandum.

Judge Kunselman files a Dissenting Memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/12/2023

---

[11] We note that both the trial court and Appellee agree the court prematurely granted *habeas* relief. **See** Trial Ct. Op. at 2; Appellee's Brief at 11.